**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**David JOHNSTON, Appellant.**

**Commonwealth of Pennsylvania,**
**Appellee**

**v.**

**Norman Johnston, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 17, 2012.
Filed March 20, 2012.

David Johnston, appellant, pro se.

Norman Johnston, appellant, pro se.

Nicholas J. Casenta, Jr., Assistant District Attorney, West Chester, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., BENDER, J. and DONOHUE, J.

OPINION BY BENDER, J.:

Appellants, siblings David and Norman Johnston, appeal *pro se* from the order entered on June 30, 2011 denying their second petitions for post-conviction relief filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546.[1] We affirm.

A summary of the pertinent facts, being indispensable in addressing the issues raised by Appellants in the instant matter, is taken from the July 21, 1995 published opinion of the Honorable Louis H. Pollack of the United States District Court for the Eastern District of Pennsylvania, denying Norman Johnston's federal habeas corpus petition. That opinion summarized the facts adduced at trial as follows:

I. FACTUAL BACKGROUND[2]

[2] The recitation of facts was culled from the trial transcript and the trial court's opinion in *Commonwealth v. Johnston*, Crim. No. 037779, slip op. at 5–11 (C.P. Chester Co. May 9, 1989).

The testimony at trial established that the petitioner [Norman Johnston] to-

---

[1] Pursuant to Appellants' joint application, the two cases have been consolidated. See

Order, 10/12/11.

gether with his two brothers, David K. Johnston and Bruce Johnston, Sr., successfully operated a burglary "ring" in Chester County, Pennsylvania, in association with Richard Mitchell, Leslie Dale, Roy Myers and James Griffin. The gang also included a group of teenagers, called the "Kiddie Gang," who primarily stole lawn tractors. Bruce Johnston, Jr., son of Bruce Johnston, Sr., James "Jimmy" Johnston, Dwayne Lincoln, James Sampson and Wayne Sampson were members of this juvenile gang.

In the spring of 1978, Bruce Johnston, Jr. ("Bruce, Jr.") began dating Robin Miller, then fifteen years of age, who encouraged Bruce, Jr. to abandon his life of crime. In June, 1978, Bruce, Jr. was arrested for the theft of a pickup truck and incarcerated. Robin wrote to Bruce, Jr. nearly every day. In one of her letters to Bruce, Jr., Robin informed him that Bruce Johnston, Sr. and James Sampson had raped her. Seeking revenge, Bruce, Jr. contacted law enforcement authorities and volunteered to testify against his father, Bruce Johnston, Sr., and others in the "gang", including David Johnston and the petitioner. (N.T. 2/11/80, 493–96).

Shortly thereafter, Bruce, Jr. testified before a federal grand jury and implicated a number of gang members in crimes involving the interstate transportation of stolen motor vehicles. As a result of the testimony of Bruce, Jr., a subpoena was served upon his half-brother, James "Jimmy" Johnston, directing James Johnston to appear before the same grand jury on August 16, 1978 (N.T. 2/21/80, 2098).

### A. The Triple Homicide

Bruce Johnston, Sr., David Johnston, Richard Mitchell and the petitioner became aware that Bruce, Jr. was cooperating with the police; that James Johnston was under subpoena to appear before the federal grand jury; and that other members of the "Kiddie Gang" would probably be called to testify. Fearing the investigation, these four men agreed upon a plan to silence all potential witnesses against them. They decided that members of the "Kiddie Gang" had to be killed.

Accordingly, Bruce Johnston, Sr. approached James Johnston in Oxford, Chester County, on August 15, 1978, the evening before he was to testify before the federal grand jury, and convinced the younger Johnston that he should not appear the next day in response to the subpoena. Bruce, Sr. told James Johnston that James was needed to assist in the theft of a lawn tractor during the night of August 16, 1978, and that Bruce, Sr. would hide James from federal authorities until the theft was accomplished and then send James to California until the grand jury investigation had abated.

In accordance with the plan, Bruce, Sr. then escorted James Johnston to a mobile home belonging to Leslie Dale, another member of the gang, and instructed Dale to keep James Johnston "out of sight" until after his scheduled appearance before the grand jury. (N.T. 2/21/80, 2098). The next day, when Bruce, Sr. observed Dale and James Johnston driving in a truck, he became upset and gave Dale money to take James Johnston to a motel with instructions to keep James there until Bruce, Sr. returned later during the evening of August 16th. James Johnston remained with Dale in the motel during the daylight hours of August 16th. (N.T. 2/21/80, 2103–10).

On the same day, Dwayne Lincoln and Wayne Sampson, two members of the "Kiddie Gang", who were also marked for execution, were approached by the Johnstons and solicited for the tractor theft that was allegedly to take place

that night. Lincoln and Sampson were then taken to the home of the Johnstons' sister, Mary Payne, where they remained during the day. (N.T. 2/20/80, 2039, 2050, 2076).

While James Johnston, Dwayne Lincoln and Wayne Sampson were secreted, Bruce, Sr., David, Richard Mitchell and the petitioner met at James Griffin's apartment to complete the plan to kill the three members of the "Kiddie Gang." (N.T. 2/25/80, 2535–38). In accordance with the plan, David Johnston gave Mitchell the sum of $50.00 to purchase shovels and lime. (N.T. 2/25/80, 2539–41). Mitchell purchased these items, and he and petitioner drove to a secluded area in Southern Chester County and prepared a large grave. (N.T. 2/21/80, 2106, 2301–14).

During the evening of August 16th, the three members of the "Kiddie Gang", first one boy and then the two others later that evening, were driven to the home of the Johnstons' mother, Louise Johnston, where they were met by Bruce, Sr., David, Mitchell and the petitioner. (N.T. 2/21/80, 2276–77). The boys were advised by Bruce Johnston, Sr. that they were needed to help with a stolen lawn tractor which had become mired in the mud. (N.T. 2/21/80, 2114, 2277–80).

When night fell, the boys were taken to an area near the gravesite and were led, one by one, to the grave. As each arrived at the grave, each was shot in the head and pushed into the grave. James Johnston, the first to die, was shot by Bruce Johnston, Sr.; Dwayne Lincoln was next shot and killed by David Johnston; and Wayne Sampson, the last to die, was shot by Richard Mitchell. The grave was then covered and the conspirators departed.[3] (N.T. 2/12/80, 617–18; 2/21/80, 2285–2300). At trial, this series of crimes was referred to as the "Triple Homicide."

[3] James Sampson, the older brother of Wayne, sometime thereafter, was told by the Johnstons that the three boys had been sent to California and were to remain there until the federal investigation waned. Dissatisfied with this explanation, James demanded to speak with his brother and threatened to contact the police, if he was not permitted to do so. (N.T. 2/27/80, 3119, 3134). Subsequently, James Sampson was shot, killed and buried in a landfill located in Chester County. (N.T. 2/25/80, 2695–2705). Although the Commonwealth charged David Johnston and the petitioner with the murder of James Sampson, the jury found them not guilty of the charges. Bruce Johnston, Sr., who was subsequently tried separately, was found guilty of Sampson's murder.

**B. Murder of Robin Miller and Attempted Murder of Bruce, Jr.**

Bruce, Jr., who continued to cooperate with the authorities, remained incarcerated at Chester County Prison but was soon transferred to Lancaster County Prison for his safety. On August 25, 1978, Bruce, Jr. was released from Lancaster County Prison on reduced bail and resided at the home of Robin Miller. Although police authorities instructed Bruce, Jr. not to reveal his location and offered him the protection afforded by the federal witness protection program, Bruce, Jr. declined.

Bruce Johnston, Sr., who became aware of Bruce, Jr.'s new residence, offered Bruce, Jr. the sum of $12,000 to recant the testimony he had earlier given before the grand jury. (N.T. 2/11/80, 287–290, 305–07, 356). At the same time, Bruce, Sr. offered as much as $15,000 to anyone who would kill Bruce, Jr. (N.T. 2/12/80, 623–32, 636, 709). The offer was accepted by David Johnston, Mitchell, Dale and the petitioner. (N.T. 2/12/80, 636–41, 660–87; 2/14/80, 1034–38). Pursuant to a prearranged plan, Mitchell, David Johnston and the petitioner regularly surveilled the dwelling in which Bruce, Jr. resided with Robin Miller, in order to ambush Bruce, Jr. at

the dwelling. The conspirators planned to kill Bruce, Jr. on the night of August 30, 1978, and all agreed that David Johnston and the petitioner would actually do the killing while Bruce, Sr. and Mitchell would, at the same time, appear and remain in a cocktail lounge in order to provide the latter two with an alibi. (N.T. 2/12/80, 687–704).

At the appointed hour, as David Johnston and the petitioner lay in wait in a field across from the dwelling, Bruce, Jr. and Robin Miller arrived at their residence by automobile. As Bruce, Jr. and Robin were about to alight from the automobile, David Johnston and the petitioner ran to the vehicle and both shot the young couple. Bruce, Jr. was shot nine times, and Robin Miller was shot once, in the throat. Bruce, Jr. miraculously survived, but Robin died at the scene, within moments of the attack. (N.T. 2/11/80, 446–452; 2/18/80, 1366–68).

Following the murder of Robin Miller, the ongoing investigation by the law enforcement authorities into the activities of the Johnstons intensified. As a result, Dale, Mitchell, Griffin and other gang members were arrested for various gang activities, and all agreed to cooperate as Commonwealth witnesses. The authorities were led to the common grave containing the bodies of James Johnston, Dwayne Lincoln and Wayne Sampson. (N.T. 2/21/80, 2239–2275). Dale, Mitchell, Griffin and the others provided the authorities with additional information concerning all the murders and other gang activities.

*Johnston v. Love,* 940 F.Supp. 738, 756–758 (E.D.Pa.1996) (footnotes in original).

David and Norman Johnston were both convicted of four counts of First Degree Murder by a jury on March 18, 1980. On October 3, 1983, David Johnston was sentenced by the Chester County Court of Common Pleas to four consecutive life sentences, and a consecutive term of twelve and a half to twenty-five years' imprisonment for related offenses. Norman Johnston received the same sentence on October 20, 1983.

David Johnston filed a direct appeal to this Court, and we initially affirmed his conviction and sentence without issuing an opinion at *Commonwealth v. David Johnston,* 361 Pa.Super. 635, 517 A.2d 1365 (1986). He then filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court, and in February 26, 1987, he also filed a motion seeking remand to the trial court for an evidentiary hearing based upon allegations of after-discovered evidence. By order dated January 29, 1988, the Supreme Court remanded the case to the Superior Court with instructions to prepare an opinion addressing the issues raised on direct appeal, and also transferred David Johnston's request for remand to the Superior Court. *Commonwealth v. David Johnston,* 523 Pa. 555, 568 A.2d 590 (1988). The Superior Court remanded the case to the trial court for a hearing on the after-discovered evidence claims.

The trial court held the evidentiary hearings in May and June of 1987. The trial court filed an opinion refusing to grant a new trial on the basis of the after-discovered evidence claims on September 22, 1987. In *Commonwealth v. David Johnston,* 403 Pa.Super. 635, 579 A.2d 418 (1990) (unpublished memorandum), we affirmed both the trial court's judgment of sentence and its denial of the motion for a new trial stemming from the after-discovered evidence claims. David Johnston subsequently filed a petition for habeas corpus in the Eastern District of Pennsylvania, but was ultimately unsuccessful.

David Johnston then filed his first PCRA petition on May 21, 1998, which was

ultimately dismissed by the trial court as untimely on July 2, 2001. He appealed to this Court, and we affirmed, and the Supreme Court subsequently denied his Petition for Allowance of Appeal on December 24, 2002. *Commonwealth v. David Johnston*, 808 A.2d 246 (Pa.Super.2002), *appeal denied*, 572 Pa. 699, 813 A.2d 838 (Pa. 2002).

Norman Johnston's foray into and through the appellate courts followed a similar path, often converging with that of his brother, David. We affirmed his judgment of sentence and the denial of his claims of after-discovered evidence on direct appeal, and our Supreme Court denied his petition for allowance of appeal. *Commonwealth v. Norman Johnston*, 402 Pa.Super. 655, 578 A.2d 38 (1990), *appeal denied*, 527 Pa. 663, 593 A.2d 839 (1991). Norman Johnston subsequently filed a petition for habeas corpus in the Eastern District of Pennsylvania, but was ultimately unsuccessful.

Norman Johnston filed his first PCRA petition on June 9, 1998. The petition was dismissed as untimely on July 11, 2001. On appeal, we remanded for an evidentiary hearing to determine whether there had been interference by governmental officials that prevented the filing of a timely PCRA. The PCRA court held a hearing and ultimately found that there had been no governmental interference that would have prevented him from filing a timely PCRA petition. We affirmed on appeal. *Commonwealth v. Norman Johnston*, 869 A.2d 9 (Pa.Super.2004) (unpublished memorandum).

On May 14, 2009, David and Norman Johnston each filed a second, *pro se* PCRA petition. They were each appointed counsel. The two cases were consolidated by the PCRA court's order dated December 9, 2010. Counsel for Norman Johnston petitioned for leave to withdraw on February 1, 2011. On March 30, 2011, David

Johnston filed a *pro se* Motion to Discharge Court Appointed Counsel. Counsel for David Johnston, prior to withdrawing, filed an Amended PCRA Petition and Memorandum of Law in Support of Amended PCRA on February 1, 2011.

On April 7, 2011, the PCRA court issued a Notice of Intent to Dismiss, and also permitted the attorneys for both David and Norman Johnston to withdraw. The Notice contained a detailed statement of the reasons for dismissal. With the case consolidated, the petitioners filed a *pro se* Motion for Leave of Court to Conduct PCRA Discovery and a Memorandum of Law on April 13, 2011. They also filed a *pro se* Response to the PCRA Court's Notice of Intent to Dismiss on May 23, 2011.

By orders dated June 30, 2011, the PCRA court dismissed both petitioners' discovery motion and the consolidated PCRA Petition. Timely Notices of Appeal followed on July 22, 2011 (David) and July 27, 2011 (Norman), which were docketed respectively at 1958 EDA 2011 and 2013 EDA 2011. As noted previously, upon application by the Appellants, we granted consolidation by order dated October 12, 2011.

Appellants present two claims of error on appeal for our review:

(1) Did the PCRA Court err[ ] in determining that the multiple *Brady* claims raised in the instant Petition did not fall within [the] § 9545(b)(1)(ii) [e]xception to the one-year filing deadline?

(2) Did the PCRA Court's denial of the withheld *Brady* material deprive Petitioners' of a fundamentally fair procedure to obtain evidence in possession of the Commonwealth to prove

actual innocence and denial of a fair trial?

Briefs for Appellants at 5.

 To begin, we note that the standard of review for review of an order denying a PCRA petition is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. *Commonwealth v. Ragan*, 592 Pa. 217, 923 A.2d 1169, 1170 (2007). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. *Commonwealth v. Carr*, 768 A.2d 1164, 1166 (Pa.Super.2001).

As a threshold jurisdictional matter, however, the timeliness of the PCRA petition must be addressed. 42 Pa.C.S. § 9545(b) sets forth the time limitations for filing of a PCRA petition as follows:

(b) Time for filing petition.—

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of

Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.

42 Pa.C.S. § 9545(b)(1)-(2).

 Petitioners must plead and prove the applicability of one of the three exceptions to the PCRA timing requirements. *Commonwealth v. Perrin*, 947 A.2d 1284 (Pa.Super.2008); *Commonwealth v. Geer*, 936 A.2d 1075, 1078–1079 (Pa.Super.2007). "If the petition is determined to be untimely, and no exception has been pled and proven, the petition must be dismissed without a hearing because Pennsylvania courts are without jurisdiction to consider the merits of the petition." *Perrin*, 947 A.2d at 1285.

There is no dispute between the parties that the Appellants presented second or subsequent requests for relief under the PCRA in the court below, and that as such their PCRA petitions would be time-barred absent the applicability of the exception enumerated in 42 Pa.C.S. § 9545(b)(1)(ii). Appellants contend that a new book chronicling the events surrounding their trial, *Jailing the Johnston Gang: Bringing Serial Murders to Justice*,[2] released to bookstores in March of 2009 and obtained by them in April of 2009, presents four "new" pieces of evidence, previously "unknown" to them and that "could not have been ascertained by the exercise of due diligence." 42 Pa.C.S. § 9545(b)(1)(ii). Appellants assert that the following four pieces of "new" evidence demonstrate that there were violations of *Brady v. Mary-*

---

2. Bruce Mowday, *Jailing the Johnston Gang: Bringing Serial Murders to Justice*, (Barricade Books, Inc. 2009).

*land,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963): [3]

 (a) On September 14, 1978, an informant at Chester County Prison told Chester County Detective, Michael Carroll, that Leslie Dale confessed to him that he murdered Robin Miller. (See *Jailing the Johnston Gang: Bringing Serial Murderers to Justice,* at p. 45).

 (b) In the summer of 1978, Richard Mitchell sent a series of letters to Chief of Chester County Detectives, Charles Zagorski, and Assistant District Attorney, Dolores Troiani, in which he made demands on Zagorski and Troiani with the ultimatum that they either meet his demands, or he would disclose information during Johnston's trial that would be detrimental to the prosecution's case. Mitchell stated: "I don't think you will like what I am going to say in the courtroom and everything I say is true." (See *Jailing the Johnston Gang: Bringing Serial Murderers to Justice,* at p. 172).

 (c) In November, 1979, Leslie Dale sent a series of letters to Zagorski and Troiani, in which he made numerous demands that they either meet his demands or "you are going to have a lot of trouble out of me in court, don't say I didn't warn you." (See *Jailing the Johnston Gang: Bringing Serial Murderers to Justice,* at p. 172).

 (d) In the photo section of *Jailing the Johnston Gang: Bringing Serial Murderers to Justice,* a photo appeared of Richard Mitchell while testifying at Johnston's 1980 trial which depicts him holding what appears to be a fifth of Rye Whisky. (See Pet's PCRA Pet., 5/14/09, Exhibit "C").

Appellant's Brief (David Johnston) at 15–16; Appellant's Brief (Norman Johnston) at 16–17.

 ■ In addressing the first of the *Brady* claims, (a), the PCRA Court determined that "this is not new information; it was available to the defendants at the time of their trial, and it was, in fact, raised during the trial." PCRA Court Opinion, citing the Order of April 7, 2011, at 3 n. 1. Because the factual assertion that Leslie Dale confessed to the killing of Robin is not new, and because the information contained in the book is merely cumulative evidence to what was known by the defense at the time of trial, we agree with the PCRA court that evidence of an additional confession by Dale to an additional person does not present an exception within the meaning of 42 Pa.C.S. § 9545(b)(1)(ii).

 The PCRA court points to two witnesses who revealed evidence of Leslie Dale's confessions during the course of the trial. *Id.* Robert Proudfoot testified that Leslie Dale told him that he (Dale) had "ambushed" Bruce Johnston, Jr., the victim who was shot and wounded in the same shooting in which Robin Miller was killed. N.T., 03/07/80, at 4693. That same information had been revealed through the testimony of Detective Jeffrey Gordon, who obtained the information during an interview with Proudfoot. N.T., 03/10/80, at 5037.

 As the Supreme Court explained in *Commonwealth v. Abu–Jamal,* 596 Pa. 219, 941 A.2d 1263 (2008), "[t]he fact appellant discovered yet another conduit for the

---

**3.** In *Brady,* the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194.

same claim of perjury does not transform his latest source into evidence falling within the ambit of § 9545(b)(1)(ii)." *Id.* at 1269. Here, Appellants "newly discovered evidence" is directed at discrediting the same witness, under the same theory, and with the same facts as had occurred during the course of the trial. The only difference this Court can ascertain is that yet another witness may have been available to testify to say that Leslie Dale had confessed to killing Robin Miller.

Appellants counter that this analysis, as undertaken by the PCRA Court, is seriously flawed because "once the court concluded that the *Brady* evidence set forth in Appellant's petition was indeed 'newly discovered,' the § 9545(b)(1)(ii) inquiry ends there because the petition then qualifies for the after discovered evidence exception to the one-year filing deadline." Brief for Appellant (David Johnston) at 16–17; Brief for Appellant (Norman Johnston) at 18. Appellants also complain that the PCRA Court erred by considering the underlying merits of the *Brady* claim in concluding that Appellants failed to overcome the jurisdictional bar of 42 Pa.C.S. § 9545(b)(1)(ii). Appellants claim their analysis is supported by the Supreme Court's decision in *Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848 (2005). We disagree.

In *Lambert,* the Commonwealth had argued to the Supreme Court "that in order for appellant's PCRA petition to fall within the cited timeliness exceptions, he must actually establish a meritorious *Brady* claim." *Lambert,* 884 A.2d at 852. The Supreme Court rejected this reasoning, holding instead that:

[t]he newly discovered evidence exception, set forth in Section 9545(b)(1)(ii) . . . does not require a merits analysis of the claim in order for it to qualify as timely and warranting merits review. The exception merely requires that the

"facts" upon which such a claim is predicated must not have been known to appellant, nor could they have been ascertained by due diligence.

*Id.* at 852.

However, the arguments of Appellants are misplaced, as the Supreme Court's holding in *Lambert* does not exist in a vacuum. As the Commonwealth correctly notes, in *Commonwealth v. Marshall,* 596 Pa. 587, 947 A.2d 714 (2008), the Supreme Court synthesized several 42 Pa.C.S. § 9545(b)(1)(ii) related cases as follows:

Exception (b)(1)(ii) "requires petitioner to allege and prove that there were 'facts' that were 'unknown' to him" and that he could not have ascertained those *facts* by the exercise of "due diligence." *Commonwealth v. Bennett,* 593 Pa. 382, 930 A.2d 1264, 1270–72 (2007) (emphasis added). The focus of the exception is "on [the] newly discovered *facts,* not on a newly discovered or newly willing source for previously known facts." *Commonwealth v. Johnson,* 580 Pa. 594, 863 A.2d 423, 427 (2004) (emphasis in original). In *Johnson,* this Court rejected the petitioner's argument that a witness's subsequent admission of alleged facts brought a claim within the scope of exception (b)(1)(ii) even though the facts had been available to the petitioner beforehand. Relying on *Johnson,* this Court more recently held that an affidavit alleging perjury did not bring a petitioner's claim of fabricated testimony within the scope of exception (b)(1)(ii) because the only "new" aspect of the claim was that a new witness had come forward to testify regarding the previously raised claim. *Abu-Jamal, supra* at 1267. Specifically, we held that the fact that the petitioner "discovered yet another conduit for the same claim of perjury does not transform his latest source into evidence falling within the

ambit of [Section] 9545(b)(1)(ii)." *Id.* at 1269.

*Marshall,* 947 A.2d at 720.

"[T]here are three necessary components that demonstrate a violation of the *Brady* strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued." *Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136, 1141 (2001). In the case *sub judice,* the PCRA Court did not make any merits analysis of the *Brady* claims in concluding that Appellants failed to overcome the 42 Pa.C.S. § 9545(b)(1)(ii) time-bar exception.

Appellants' claims fail to meet the requirements of 42 Pa.C.S. § 9545(b)(1)(ii), not because they lack merit as *Brady* material, a determination we do not reach at this time, but rather because they are but another conduit for or new source of previously known facts. *Abu–Jamal, supra; Johnson, supra.*

■ Appellant's remaining three claims, (b), (c) and (d) above, all fail to meet the requirements of the § 9545(b)(1)(ii) time-bar exception for the same or similar reasons. The letters sent by Richard Mitchell and Leslie Dale to prosecutors, threatening unfavorable testimony in the event the Commonwealth failed to meet various demands regarding prison conditions, would only present cumulative impeachment evidence, and thus offer only additional conduits or sources for presenting the same perjury-related claims that were offered during the course of prior litigation. *Abu–Jamal, supra; Johnson, supra.* This is true even assuming the letters constitute withheld *Brady* material, a question we do not reach.

As the Commonwealth aptly summarized, Leslie Dale was "cross-examined concerning his plea agreement, his revoked plea agreement, what he received in exchange for his testimony, his lies, his inconsistent statements, and murders he committed." Commonwealth's Brief at 39; *see also* N.T., 02/14/80, at 1111–1118, 1161–1172.

Richard Mitchell was also "cross-examined concerning his plea agreement, his revoked plea agreement, what he received in exchange for his testimony, his lies, his inconsistent statements, and murders he committed." Commonwealth's Brief at 39; *see also* N.T., 02/13/80, at 732–845; 02/22/80, 2349–2445; 02/26/80, at 2728–2795.

Appellants provide nothing to suggest that any of the demands made in the letters were met by the prosecutors above and beyond the information that was already before the jury. There is no indication of what the content of the negative or unfavorable testimony would have been, nor for that matter, whether Dale and Mitchell refrained from following through with those threats when they testified. For all of these reasons, we find Appellants' arguments unpersuasive that the letters in question qualify under the § 9545(b)(1)(ii) time-bar exception.

■ The fourth claim of an § 9545(b)(1)(ii) exception is with regards to the photograph of Richard Mitchell in *Jailing the Johnston Gang: Bringing Serial Murderers to Justice,* depicting Mitchell lying in a bed with a fifth of whiskey, purportedly taken during the course of the trial. Appellants suggest the photo presents evidence that Mitchell was provided with alcohol in exchange for his testimony. Appellants contend that the discovery of this photograph invokes the § 9545(b)(1)(ii) exception. We disagree.

As the PCRA court and the Commonwealth demonstrate, the issue of Mitchell's fondness for and abuse of alcohol was certainly known to the jury. Mitchell, on numerous occasions, admitted to drinking

copious amounts of alcohol. N.T., 02/13/80, at 755–757. He was even confronted by defense counsel regarding whether or not he was drinking while testifying. N.T., 02/22/80, at 2382. The PCRA court correctly notes that there is no evidence that the alcohol in the photograph was provided by the Commonwealth. PCRA Court Opinion, citing the Order of April 7, 2011, at 4 n. 1. There is also no evidence that would demonstrate or tend to demonstrate that Mitchell's condition, as depicted in the photograph, was a result of drinking that occurred before or during his testimony, rather than a binge that occurred after the court room activities had been completed for the day. Accordingly, we also reject the claim that the photograph provides a § 9545(b)(1)(ii) exception to the jurisdictional time-bar.

Finally, we must address Appellants' second claim of error, that the PCRA court abused its discretion in denying Appellants' specific request for discovery of the aforementioned *Brady* materials—particularly the photograph and the letters. We disagree.

The PCRA court and the Commonwealth both contend that Appellants failed to meet their burden in demonstrating "exceptional circumstances" under Pa. R.Crim. P. 902(E)(1) to permit PCRA discovery. Appellants, on the other hand, contend their request for discovery was both limited and narrowly tailored to the aforementioned *Brady* claims, and necessary to demonstrate the "full extent of the 'threats' and 'demands'" contained in the letters and necessary for the identification of "the brand of alcohol depicted in the photo." Appellant's Brief (David Johnston) at 34; Appellant's Brief (Norman Johnston) at 35. While we may be inclined to agree that exceptional circumstances have not been demonstrated, we cannot reach that question.

Pa. R.Crim. P. 902 provides, in pertinent part, that "[e]xcept as provided in paragraph (E)(2), no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of exceptional circumstances." Pa. R.Crim. P. 902(E)(1).

However, the PCRA Court's ability to order discovery is precluded by the lack of jurisdiction demonstrated by the failure of the Appellants to satisfy the § 9545(b)(1)(ii) exception to the time-bar. As has been routinely stated by the Supreme Court of Pennsylvania, "[t]he PCRA's timeliness requirements are jurisdictional in nature and must be strictly construed; courts may not address the merits of the issues raised in a petition if it is not timely filed." *Abu–Jamal,* 941 A.2d at 1267–68; *see also, Commonwealth v. Beasley,* 559 Pa. 604, 741 A.2d 1258, 1261 (1999); *Commonwealth v. Fahy,* 558 Pa. 313, 737 A.2d 214, 222 (1999); *Commonwealth v. Peterkin,* 554 Pa. 547, 722 A.2d 638, 641 (1998).

We, therefore, conclude that Appellants' second *pro se* PCRA petitions were untimely, and that they failed to meet an exception to the PCRA timeliness requirements. Because the PCRA court below lacked jurisdiction, it was precluded from entertaining a motion for PCRA discovery.

Orders Affirmed.