**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT SCHMIDT | : | |
| | : | |
| Appellant | : | No. 2607 EDA 2023 |

Appeal from the PCRA Order Entered September 11, 2023
In the Court of Common Pleas of Northampton County Criminal Division
at No(s): CP-48-CR-0003127-2011

BEFORE: LAZARUS, P.J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, P.J.: **FILED OCTOBER 24, 2024**

Robert Schmidt appeals from the order, entered in the Court of Common Pleas of Northampton County, dismissing his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. After careful review, we affirm.

This Court previously summarized the facts of the case as follows:

On or about June 7, 2002, human remains were discovered during excavation taking place at 829 South Mink Road, Danielsville, Moore Township, Northampton County. Forensic testing subsequently identified the remains as those of Robert J. Sarko[] and determined that the remains had been buried for over a year. There was evidence of a gunshot wound to the back of the head and evidence of a slicing wound to the neck, either of which could have been the cause of death.

Sarko's family made missing person reports for him in October of 2000, after they had not heard from him for several months. At the time of his disappearance, Sarko resided with [Schmidt] and

_____

[*] Retired Senior Judge assigned to the Superior Court.

[Schmidt's] family at their residence at 829 South Mink Road. Three years earlier, Sarko had met [Schmidt] at Muhlenberg Hospital, where both were psychiatric patients. Sarko moved in with [Schmidt] and his family shortly thereafter and had resided there until his disappearance.

In June of 2000, [Schmidt] and his family left the residence for a vacation in Ocean City, Maryland. Sarko remained at the residence to care for [Schmidt's] mother, who suffered from Alzheimer's, and the family's various outdoor and household animals. During that time, Agent Kathy Andrews of the Northampton County SPCA, responding to a complaint, arrived at [Schmidt's] residence where she encountered Sarko. Agent Andrews found the condition of the various animals deficient. In the course of removing the animals, Sarko turned over two Pug puppies, begging Agent Andrews "not to tell [Schmidt] that he gave them to [Agent Andrews,] or [Schmidt] would kill him." N.T. [Jury Trial], 7/11/12, at 25.

[Schmidt's] family members testified that Sarko was at the residence the night they returned from vacation, but that was the last time they saw him. [Schmidt] told his son that Sarko left in the middle of the night wearing clothing belonging to [Schmidt's] mother. Sarko's belongings remained at the premises. The day after the family's return from Ocean City, Maryland, Brian Miller, the then[-]fiancé of [Schmidt's] oldest daughter, noticed a barn that was usually unlocked was now locked. The following weekend, upon returning from an outing with other members of the family, Miller noticed that a backhoe, which was kept on the property and used only by [Schmidt], had been moved.

Sometime later, but before Sarko's body was discovered, [Schmidt] confessed to Miller that he had killed Sarko.

\* \* \*

During subsequent inquiries by the police in response to Sarko's missing person case, [Schmidt] instructed Miller to say that he didn't know Sarko. Miller complied and lied to authorities on a number of occasions. [Schmidt] told Miller he "did a good job not saying nothing." *Id*. at 112. Around various times when the authorities were questioning Miller or his then[-]fiancé[e], the frequency and duration of cell phone activity between [Schmidt] and Miller increased. A day after [Schmidt's] police interview, on

- 2 -

February 26, 2002, Miller accompanied [Schmidt] to Kris Snyder's Auto Sales.

Susan Hamm was employed at Kris Snyder's Auto Sales in 2002 as [an] office manager. In February of 2002, another employee turned over a wallet found in one of the vehicles. Upon her inspection of the wallet, she ascertained it belonged to Sarko[,] whose address appeared to be 829 South Mink Road. She sent a letter addressed to Sarko advising that the wallet had been found. [Schmidt] turned this letter and others over to investigators on March 12, 2002. The police retrieved the wallet from Hamm in the condition she found it.

The wallet contained a typewritten letter, bearing Sarko's apparent signature, explaining why he left the 829 South Mink Road address, a receipt from K-Mart dated February 10, 2002, and the citations issued by Agent Andrews to Sarko in June of 2000. Police subsequently viewed relevant security camera recordings from the K-Mart store. Sarko did not appear on the recordings[,] but [Schmidt] did. Forensic analysis determined the signature on the typed letter was not a natural signature.

\* \* \*

In 2002, the new owners of the 829 South Mink Road property hired contractors to perform excavation on the premises in preparation for new construction. In the course of excavating a waterline trench, the excavator discovered a suspicious bone and reported it to the police. The bone was identified as human. The [c]oroner then supervised a further forensic excavation, unearthing more remains, including portions of a skull. The remains were submitted for forensic testing[,] with the results as related above.

On July 12, 2012, [a] jury found [Schmidt] guilty of first-degree murder. The trial court immediately sentenced [Schmidt] to mandatory life imprisonment without the possibility of parole.

*Commonwealth v. Schmidt*, 2175 EDA 2012, at *1-9 (Pa. Super. filed June 27, 2013) (unpublished memorandum decision).

- 3 -

On direct review, this Court affirmed Schmidt's judgment of sentence, *id.*, and the Supreme Court denied his petition for allowance of appeal. *Id.*, 83 A.3d 168 (Pa. 2013).

On May 15, 2014, Schmidt filed a *pro se* PCRA petition, his first.[1] On May 21, 2014, the court appointed counsel. After a series of changes to counsel, Matthew Deschler, Esquire, was eventually appointed as new conflict counsel on March 12, 2018. On December 6, 2019, Schmidt filed an amended counseled PCRA petition. The court finally held the first hearing on Schmidt's PCRA petition on September 28, 2020, and a second hearing on March 31, 2021. On September 11, 2023, the PCRA court dismissed Schmidt's amended petition.

Schmidt filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Schmidt presents the following issue on appeal:

> Was [Alexander J. Karam, Jr., Esquire, trial and direct appeal counsel,] ineffective for failing to object on hearsay and relevance grounds to [Agent] Andrews testifying about what [] Sarko[] told her on June 30, 2000?

Appellant's Brief, at 4.

The standard of review of an order denying a PCRA petition is whether that determination is supported by the evidence of record and is free of legal error. *See Commonwealth v. Johnston*, 42 A.3d 1120, 1126 (Pa. Super.

---

[1] It is undisputed that Schmidt's PCRA petition was timely filed within one year of the date his judgment of sentence became final, in compliance with 42 Pa.C.S.A. § 9545(b).

2012). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. *Id.*

Schmidt argues that the PCRA court erred by not granting his petition where counsel failed to object to Agent Andrews' testimony that Sarko begged Agent Andrews not to tell Schmidt he turned over certain puppies, for fear that Schmidt would kill him, as such testimony was irrelevant, hearsay, and prejudicial. *See* Appellant's Brief, at 9. Schmidt asserts that this failure amounted to ineffective assistance of counsel, as Schmidt "would likely have been acquitted" if the statement was excluded and there was no strategic basis for failing to object. *Id.*

When a petitioner claims that he has received ineffective assistance of counsel, relief will only be granted with a showing, by a preponderance of the evidence, that:

> his conviction or sentence resulted from the [i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner. To obtain relief, a petitioner must demonstrate that counsel's performance was deficient[,] and that the deficiency prejudiced the petitioner. **A petitioner establishes prejudice when he demonstrates that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different**. . . . [A] properly pled claim of ineffectiveness posits that: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell the petitioner from counsel's act or omission.

*Commonwealth v. Johnson*, 966 A.2d 523, 532-33 (Pa. 2009) (citations and quotation marks omitted) (emphasis added); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987) (adopting *Strickland*).  Moreover, if any of the three prongs are not satisfied, the claim fails.  *Commonwealth v. Jones*, 942 A.2d 903, 906 (Pa. Super. 2008) (citation omitted).

Here, Schmidt argues Agent Andrews' testimony[2] was both irrelevant and hearsay.  *See* Appellant's Brief, at 9.  Further, Schmidt states that counsel

---

[2] The relevant portion of Agent Andrews' testimony on direct examination is as follows:

Q:  Did you prepare a report of your contact with [] Sarko on [] June 30th, 2000?

A:  Yes

\*    \*    \*

Q:  Could you read [the portion of the report that indicates findings]?

A:  Executed Search and Seizure warrant to confiscate any and all animals in need of care, food, and water.  [] Sarko, who is supposed to be the caretaker for the animals and the elderly mother, does release from [the] house two six-month-old male and female Pug dogs, and [Sarko] repeatedly begged us not to tell [] Schmidt that he gave them to me[, Agent Andrews,] or [Schmidt] would kill him.

He really seemed frightened at the time.  And I did account for the dogs on my inventory sheet.

\*    \*    \*

*(Footnote Continued Next Page)*

was ineffective for failing to object to the testimony on this basis, even conceding that the testimony was relevant, and only challenging the testimony on the grounds that admission had a prejudicial effect under Pa.R.E. 403. *Id.* at 11-12. Schmidt contends that the purpose of Agent Andrews' testimony was to "establish motive on the part of Schmidt," that he would "kill Sarko if he found out that Sarko [] let Andrews take the animals[,]" and that this is offered "for the truth of the matter asserted[.]" *Id.* Schmidt argues that such a statement goes to Sarko's belief, and thus does not fall under any sort of hearsay exception. *Id.* at 12-13. Specifically, Schmidt posits the statement is not admissible under the state-of-mind exception set forth in Pa.R.E. 803(3). *Id.* (citing to *Commonwealth v. Thornton*, 431 A.2d 248 (Pa. 1981); *Commonwealth v. Fitzpatrick*, 255 A.3d 452 (Pa. 2021);

---

Q: And when he turned over these dogs, you describe in your report that [] Sarko repeatedly begged you not to tell [] Schmidt?

A: Yes.

        *      *      *

Q: In your observation of [] Sarko's demeanor on [] June 30[,] 2000 [], as you described it, you've described him as seeming frightened?

A: Terrorized.

        *      *      *

Q: And to whom did you issue citations?

A: I issued citations to [] Schmidt, as the owner of the animals. And to [] Sarko, as the caretaker.

N.T. Trial (Day 3), 7/11/12, at 24-29.

*Commonwealth v. Green*, 76 A.3d 575 (Pa. Super. 2013)). With respect to relevance, Schmidt argues that "Sarko's unexplained belief. . . is probative of nothing at all." Appellant's Brief, at 13. Schmidt suggests that Sarko could have claimed anyone—even the Pope—would kill him for turning over the animals, but that would not suggest the Pope killed Sarko. *Id.*

Regarding the second *Strickland* prong, Schmidt argues that there is no reasonable strategic basis for counsel failing to object to Agent Andrews' testimony on hearsay and relevance grounds. *Id.* at 13. Further, Schmidt argues that this issue has never been addressed by the courts, that this Court has only ruled that the trial court did not err when it denied counsel's motion *in limine* to exclude the testimony on the basis of prejudicial effect, and that counsel could not have raised this issue on direct appeal because his actions waived such a claim. *Id.* at 14, citing *Commonwealth v. McGriff*, 160 A.3d 863, 871-72 (Pa. Super. 2017).

Finally, Schmidt argues that counsel's failure to object to the testimony on the grounds of relevance and hearsay resulted in actual prejudice and that there "is no underestimating the damaging impact of [Agent] Andrews' testimony." Appellant's Brief, at 14. Agent Andrews was a "credible witness," and no other witnesses had "the power of [Agent] Andrews' testimony." *Id.* at 14-16 (suggesting Miller not credible with history of lying to police and *crimen falsi* conviction; Shane Gallahan not credible because inconsistent about Sarko's manner of death and statement made eight years after Sarko's

death). Schmidt concludes that, but for Agent Andrews' testimony, the "outcome of the trial would likely have been different." **Id.** at 16.

The Commonwealth, in contrast, argues that Schmidt fails to meet any of the three **Strickland** prongs because Agent Andrews' testimony was both relevant and admissible under two hearsay exceptions—present sense impression and excited utterance, Pa.R.E. 803(1) and (2), respectively.[3] **See** Appellee's Brief, at 2-3, 4-5.

First, the Commonwealth argues that Agent Andrews' testimony as to Sarko's statement was relevant and was a "reasoned conclusion, based on [Sarko's] experience and history of dealings with Schmidt," that Schmidt would have both the motive and ability to kill him. **Id.** at 6. Further, the Commonwealth states that both the trial court and this Court have determined that Sarko's statement to Agent Andrews was indeed relevant and not unduly

_____

[3] The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

> (1) *Present Sense Impression.* A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it. When the declarant is unidentified, the proponent shall show by independent corroborating evidence that the declarant actually perceived the event or condition.

> (2) *Excited Utterance.* A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused. When the declarant is unidentified, the proponent shall show by independent corroborating evidence that the declarant actually perceived the startling event or condition.

Pa.R.E. 803(1)-(2).

prejudicial to Schmidt. *See id.* at 7, citing *Schmidt*, *supra*, at *19-*21 (Superior Court held trial court did not err by permitting admission of statement). In addition, the Commonwealth asserts that Agent Andrews' testimony, *see supra* at n.2, makes clear that Sarko was "experiencing a startling . . . event and condition," he "made his statements to Agent Andrews contemporaneously," and his "nervous excitement" dominated. *Id.* at 12. Thus, the Commonwealth concludes, the statement was admissible under the present sense impression and excited utterance hearsay exceptions. *Id.*

Second, the Commonwealth contends that, because the statement was admissible hearsay, counsel has a reasonable basis for not raising such an objection. The Commonwealth highlights *Commonwealth v. Johnson*, 139 A.3d 1257, 1272 (Pa. 2016), for the assertion that trial counsel is not required to raise meritless objections. In addition, the Commonwealth states that Schmidt failed to demonstrate an alternative strategy that would have been more advantageous for counsel to pursue and, thus, Schmidt's claim fails the second *Strickland* prong. *Id.* at 14.

Third, the Commonwealth argues that even if there was merit to Schmidt's assertion that counsel should have objected to Sarko's statement based on relevance and hearsay and that counsel had no strategic basis for failing to make that objection, Schmidt cannot establish counsel was ineffective because he cannot establish actual prejudice. *Id.* at 14. The Commonwealth points to Schmidt's direct appeal, wherein this Court identified the significant evidence against Schmidt: Schmidt's confession to Miller;

Schmidt instructing Miller to lie to law enforcement; Schmidt's statement to Gallahan;[4] Schmidt's concealment of Sarko's death, i.e., Schmidt leaving Sarko's wallet in a vehicle, giving conflicting statements to both law enforcement and a magisterial district judge as to Sarko's whereabouts; Schmidt collecting Sarko's social security payments; and the discovery of Sarko's body on Schmidt's property. **See Schmidt**, **supra**, at *1-*9. The circumstantial evidence, the Commonwealth suggests, was sufficient to support Schmidt's conviction and the evidence of his guilt "was compelling." Appellee's Brief, at 16. Thus, Schmidt "cannot demonstrate that he suffered actual prejudice as a result of [] trial counsel's purported errors." **Id.**

The PCRA court heard testimony with respect to Schmidt's claim on September 28, 2020. Attorney Karam testified as follows:

> Q: [] One of the issues that was raised in the amended petition was that you were ineffective for failing to object[,] on relevance and hearsay grounds[,] to the admission of testimony of [Agent] Andrews about statements made by the victim. Do you recall that item being in this PCRA petition?
>
> A: Yes.
>
>          \*      \*      \*
>
> Q: Okay. . . . It's true that prior to trial, you did file a motion *in limine* to attempt to exclude aspects of [Agent] Andrews' testimony. Do you recall that?
>
> A: I do.

---

[4] Gallahan, an associate of Schmidt's, testified that he sold drugs and that he held guns for Schmidt, and that Schmidt told him Sarko and Schmidt had argued and it got "out of hand." N.T. Trial (Day 3), 7/11/12, at 244.

- 11 -

Q: Okay. And it's also true that the grounds you asserted for attempting to exclude those parts of [Agent] Andrews' testimony were that her testimony would be unduly prejudicial to [] Schmidt; correct?

A: Correct.

* * *

Q: Now, . . . it's true that in this motion, you seek to exclude statements of [Agent] Andrews on grounds that the probative value is outweighed by the danger of unfair prejudice to [] Schmidt; correct?

A: Correct.

Q: So[,] in other words, you're conceding the relevance of [Agent] Andrews' testimony, you're just objecting on grounds that the unfair prejudice outweighs the probative value?

A: That's correct.

Q: And you also did not object to the admission of [Agent] Andrews' testimony on hearsay grounds; correct?

A: That[,] I'm not aware of.

* * *

Q: Now, it's fair to say that [Agent] Andrews' statement that [] Sarko told her on June 30, 2000[,] that he [] believed that [] Schmidt would kill him, [] that was damaging testimony at the trial of [] Schmidt; correct?

A: Yes.

Q: Okay. Now, the Commonwealth was offering that testimony for the truth of the matter, wasn't it?

A: Yes. Part of their evidence, correct.

* * *

Q: Is there any reason why you did not seek to exclude or object to that testimony on hearsay grounds?

A: Well, based upon the fact that I filed a motion *in limine* indicating that it was prejudicial[,] and the probative value is outweighed by the prejudicial value was denied by the [c]ourt.

- 12 -

And the reason why if I would have objected on hearsay grounds, it would be denied. It was also denied on the ruling of Judge Zito on a post-sentencing [motion] to exclude the statements. So that answers your question, I hope.

*　　*　　*

Q: And now going to the relevance of [Agent] Andrews' testimony. Was her testimony relevant?

*　　*　　*

A: **Yes, it was. It was one thing that was relevant among many other [items] of evidence presented in trial, yes.**

N.T. PCRA Hearing, 9/28/20, at 4-12 (emphasis added).

The PCRA court considered the testimony from the hearing, Schmidt's amended PCRA petition and supporting brief, as well as the Commonwealth's brief in opposition. *See* Order of Court, 9/11/23, at 1. The PCRA court determined that Sarko's statement to Agent Andrews was relevant to Schmidt's trial for the same reasons the trial court gave on the first day of trial, that "it supports a reasonable inference regarding the existence of a material fact." *Id.* at 4 (quoting N.T. Trial (Day 1), 7/9/12, at 127). In addition, the PCRA court concurred with the trial court that the statement was "highly probative and inculpatory." *Id.* at 5 (quoting Trial Court Opinion, 2/4/13, at 23). Finally, the statement established "a possible motive [which] dovetails with the other evidence in the case." *Id.* (quoting Trial Court Opinion, 2/4/13, at 23-24).

Further, the PCRA court determined that Sarko's statement to Agent Andrews was admissible under both hearsay exceptions, Rules 803(1) and 803(2)—present sense impression and excited utterance, respectively. *See*

Order of Court, 9/11/23, at 5. Thus, the PCRA court held that Schmidt did not prove that counsel was ineffective for failing to object to Agent Andrews' testimony on relevancy or hearsay grounds. *Id.*; *see also Johnson*, *supra.* We discern no error.

The PCRA court found that Sarko's statement was admissible hearsay under the exceptions of present sense impression and excited utterance. Rather than address this finding, Schmidt simply argued that the statement was not admissible under the state of mind exception, referring to a declarant's then-existing mental, emotional, or physical condition. *See* Appellant's Brief, at 11-13; *see also* Pa.R.E. 803(3). Schmidt's argument before this Court did not address the PCRA court's basis for dismissal of Schmidt's PCRA petition, that Sarko's statement was admissible hearsay under the exceptions of present sense impression and excited utterance. The PCRA court's determination that Sarko's statement, as memorialized in Agent Andrew's report, was both relevant and met a hearsay exception is supported by the testimony from Schmidt's motion *in limine* hearing, as well as by the record as a whole.[5] Thus, we will not disturb the PCRA court's findings. *See Johnston*, *supra*.

_____

[5] We also note that Agent Andrews was one of 26 Commonwealth witnesses, one of whom was Miller, who testified that Schmidt confessed to him and made him lie to the police. The record also included evidence that Schmidt cashed Sarko's social security checks, that Schmidt likely forged Sarko's signature on various occasions between the years 2000-2002, that Schmidt lied to police about Sarko's whereabouts on several occasions, and that, *inter alia*, Sarko's body was discovered on Schmidt's property.

Order affirmed.


Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary


Date: 10/24/2024