J-S04002-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAKINS RONESS SACKIE | : | |
| | : | |
| Appellant | : | No. 1687 EDA 2025 |

Appeal from the PCRA Order Entered June 9, 2025
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0003442-2022

BEFORE: LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED MARCH 2, 2026**

Dakins Roness Sackie appeals from the order, entered in the Court of Common Pleas of Lehigh County, following the dismissal, after a hearing, of his Post Conviction Relief Act (PCRA) petition. *See* 42 Pa.C.S.A. §§ 9541-9546. Sackie's counsel, Kimberly F. Makoul, Esquire, has also filed an application seeking to withdraw from this collateral appeal. After careful review, we affirm on the basis of the thorough PCRA opinion authored by the Honorable Anna-Kristie M. Marks and grant counsel's motion to withdraw.

In 2022, Sackie was arrested and charged with several sexual offenses stemming from his communication with an undercover agent, whom he believed was a 19-year-old girl arranging for him to receive a "BBBJ" (bareback blowjob) from a 15-year-old girl. Using an online escort service called "Skipthegames.com," Sackie and the agent discussed prices, ages of girls, and his interest in receiving oral sex from a 15-year-old girl in exchange

for fast food and Pepperidge Farm goldfish. Law enforcement officers, which included members from the Allentown Police Department's Homeland Security Human Trafficking Task Force, set up surveillance units at the Upper Macungie Township Motel 6, where Sackie had agreed to meet the girls. While law enforcement officers were in the process of apprehending Sackie at the Motel 6, Sackie forcefully attempted to flee from the agents, resulting in several officers being injured and Sackie, himself, being "body check[ed] . . . into the corner of the exterior wall of the [motel] hallway[.]" PCRA Court Opinion, 6/9/25, at 18. Sackie fell out of a second-floor hallway window through broken glass and landed on the parking lot. Sackie was transported to Lehigh Valley Hospital-Cedar Crest with a deep laceration on his left upper arm, a neck fracture, and two broken legs. *See id.* at 19-20.

Sackie was arrested and charged with one count each of unlawful contact with a minor (F-1),[1] attempted involuntary deviate sexual intercourse with a person less than 16 years of age (F-1),[2] and two counts of resisting arrest.[3] On February 9, 2023, Sackie filed a pre-trial motion seeking to suppress data obtained from his cell phone and the passcode for the cell phone that he gave to police officers in the hospital's emergency room when he was being treated for his injuries. The motion also asserted that the evidence was

_____

[1] 18 Pa.C.S.A. § 6318(a)(1).

[2] *Id.* at § 901(a); *id.* at § 3123(a)(7).

[3] *Id.* at § 5104.

insufficient to prove the charge of resisting arrest. Following a hearing and after receiving memoranda from the parties, the court denied the motion. A jury trial was held in the matter in February 2024. Prior to deliberations, defense counsel requested that the court give an entrapment instruction to the jury, which the court denied. Ultimately, the jury returned a guilty verdict on the sexual offenses and acquitted Sackie of resisting arrest.

Following the verdict, the court revoked Sackie's bail and ordered the preparation of a presentence investigation report. On May 2, 2024, the court sentenced Sackie to an aggregate term of incarceration of 84-168 months. Sackie was classified as a Tier III offender under our Commonwealth's Sexual Offender Registration and Notification Act, requiring him to register with the Pennsylvania State Police for his lifetime. *See* 42 Pa.C.S.A. § 9799.10, et. seq. Sackie did not meet the criteria to be classified as a sexually violent predator. At the conclusion of sentencing, Sackie indicated that his attorney had gone over his appeal rights with him and that he did not have any questions about those rights. *See* N.T. Sentencing Hearing, 5/2/24, at 16.

On the date of sentencing, Sackie signed a document titled "Important Post-Sentence Information" which included details on his right to a file post-sentence motion and notice of appeal, the time within which to file same, his right to the assistance of counsel to prepare a post-sentence motion or any appeal, and a notice that his attorney's representation would terminate in 30 days if he did not file a post-sentence motion or appeal. *See* Important Post-

Sentence Information, 5/2/24, at 1-2. Sackie did not file a post-sentence motion or direct appeal.

On December 31, 2024, Sackie sent a *pro se* letter to the trial court, which the court treated as a timely *pro se* PCRA petition, seeking reinstatement of his direct appeal rights and the appointment of PCRA counsel. On January 8, 2025, the PCRA court appointed counsel who filed an amended petition. The petition alleged that trial counsel, Charles E. Dutko, Jr., Esquire, failed to file a direct appeal, despite: Sackie informing counsel prior to trial that if he were convicted he wished to file a direct appeal to this Court; counsel not explaining to Sackie his appellate rights or possible areas of appeal; Sackie attempting to contact Attorney Dutko several times after sentencing to request he file a direct appeal; and Sackie writing to Attorney Dutko seeking information regarding an appeal. *See* Amended PCRA Petition, 3/31/25, at ¶ 11. The amended PCRA petition also raised several other issues, including challenges to the suppression court's rulings and the court's refusal to give the jury an instruction on entrapment, as well as a claim that the evidence was insufficient to convict Sackie of unlawful contact of a minor. *See id.* at ¶ 12.

Following a hearing, at which Attorney Dutko, Sackie, and Sackie's mother testified, the court denied his petition. Sackie filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Subsequently, PCRA counsel filed an application to withdraw in this Court. Sackie raises the following issues for our review:

> (1) Whether the PCRA court abused its discretion by holding that trial counsel adequately informed [Sackie] regarding his post[-]sentence and appeal rights and [Sackie] knowingly decided not to appeal.
>
> (2) Whether [Sackie] is entitled to PCRA relief due to the failure of trial counsel to object to the trial court's jury instructions, which omitted an instruction regarding entrapment, by filing to object following the court's jury charge.
>
> (3) May appointed counsel be permitted to withdraw after a conscientious review of the issues and the facts pursuant to [] **Anders**[.[4]]

**Anders** Brief, at 4.

The standard of review of an order denying a PCRA petition is whether that determination is supported by the evidence of record and is free of legal error. **Commonwealth v. Johnston**, 42 A.3d 1120, 1126 (Pa. Super. 2012). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. **Id.**

Before we address the merits of Sackie's issues on appeal, we must first review counsel's application to withdraw. Our Supreme Court has stated that independent review of the record by competent counsel is required before withdrawal from PCRA representation is permitted. Such independent review

---

[4] **See Anders v. California**, 386 U.S. 738 (1967). It is well-established that counsel seeking withdraw from PCRA representation should proceed under the dictates of **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988), **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (en banc). However, because an **Anders** brief provides greater protections to the defendant, we will accept counsel's **Anders** brief in the instant matter. **See Commonwealth v. Fusselman**, 866 A.3d 119, 111 n.3 (Pa. Super. 2004). Sackie's final issue on appeal is merely a restatement of this Court's obligation to independently review his application to withdraw. Thus, it is addressed first and separately from his substantive legal issues raised on appeal.

requires proof of: (1) a "no-merit" letter by PCRA counsel detailing the nature and extent of his review; (2) the "no-merit" letter by PCRA counsel listing each issue the petitioner wished to have reviewed; (3) PCRA counsel's explanation, in the "no-merit" letter, as to why the petitioner's issues are meritless; (4) independent review of the record by the PCRA or appellate court; and (5) agreement by the PCRA or appellate court that the petition was meritless. *Commonwealth v. Rykard*, 55 A.3d 1177, 1184 (Pa. Super. 2012).

In *Commonwealth v. Friend*, 896 A.2d 607 (Pa. Super. 2006),[5] this Court imposed an additional requirement for counsel seeking to withdraw from collateral proceedings:

> PCRA counsel who seeks to withdraw must contemporaneously serve a copy on the petitioner of counsel's application to withdraw as counsel, and must supply to the petitioner both a copy of the "no-merit" letter and a statement advising the petitioner that, in the event that the court grants the application of counsel to withdraw, he or she has the right to proceed *pro se* or with the assistance of privately retained counsel.

*Id.* at 614.

After determining that counsel has satisfied the above technical requirements, this Court must then "conduct a simple review of the record to

_____

[5] This Court's holding in *Friend* was subsequently overruled on other grounds by the Supreme Court in *Commonwealth v. Pitts*, 981 A.2d 875, 876 n.1 (Pa. 2009). However, the additional requirement that counsel provide copies of the relevant documentation to the petitioner remains intact. *Commonwealth v. Widgins*, 29 A.3d 816, 818 (Pa. Super. 2011).

ascertain if there appears on its face to be arguably meritorious issues that counsel, intentionally or not, missed or misstated." ***Commonwealth v. Dempster***, 187 A.3d 266, 272 (Pa. Super. 2018) (en banc).

Here, counsel has substantially complied with the ***Turner***/***Finley*** and ***Friend*** requirements. Counsel has detailed the nature and extent of his review, served a copy of his petition to withdraw and brief upon Sackie, informed Sackie of his right to proceed *pro se* or with privately retained counsel, raised Sackie's issues in the form of a brief, and explained why Sackie's claims are meritless. We now turn to an independent review of the record to determine whether Sackie's claims merit relief.

In his first issue, Sackie claims that counsel was ineffective for failing to advise him of his post-sentence and direct appeal rights. Specifically, Sackie testified at the PCRA hearing that Attorney Dutko did not discuss with him the possibility of filing post-sentence motions or an appeal, or the issues that could be raised on appeal. ***See*** N.T. PCRA Hearing, 5/12/25, at 6.

> Pursuant to [***Roe v. Flores-Ortega***, 528 U.S. 470 (2000) and its Pennsylvania expression, ***Commonwealth v. Touw***, 781 A.2d 1250 (Pa. Super. 2001)], counsel has a constitutional duty to consult with a defendant about an appeal where counsel has reason to believe either (1) that a rational defendant would want to appeal (for example, because there are non[-]frivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. [***Id.***] at 1254 (quoting ***Roe***[, ***supra***] at 480[.]

***Commonwealth v. Bath***, 907 A.2d 619, 623 (Pa. Super. 2006) (some quotation marks omitted). Moreover,

[W]here there is an unjustified failure to file a requested direct appeal, the conduct of counsel falls beneath the range of competence demanded of attorneys in criminal cases, denies the accused the assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution, as well as the right to direct appeal under Article V, Section 9, and constitutes prejudice for purposes of [subs]ection 9543(a)(2)(ii). Therefore, in such circumstances, and where the remaining requirements of the PCRA are satisfied, the petitioner is not required to establish his innocence or demonstrate the merits of the issue or issues which would have been raised on appeal.

*Commonwealth v. Lantzy*, 736 A.2d 564, 572 (Pa. 1999) (internal footnote omitted). "Differently put, if counsel neglects to file a requested direct appeal, 'counsel is *per se* ineffective[,] as the defendant was left with the functional equivalent of no counsel.'" *Commonwealth v. Markowitz*, 32 A.3d 706, 715 (Pa. Super. 2011).

"Nonetheless, even if a defendant does not expressly ask counsel to file a direct appeal, counsel still has a duty 'to adequately consult with the defendant as to the advantages and disadvantages of an appeal where there is reason to think that a defendant would want to appeal.'" *Bath*, 907 A.2d at 623. "Where the defendant did not request counsel to file a direct appeal[,] but counsel failed to consult with the defendant, counsel is not *per se* ineffective and the court applies the traditional three-prong test 'to decide whether counsel rendered constitutionally ineffective assistance by failing to advise [the] client about his appellate rights.'" *Markowitz*, *supra* at 716.

After a comprehensive review of the parties' briefs, the relevant case law, and the record on appeal—in particular the notes of testimony from the

PCRA hearing—we rely upon Judge Marks' PCRA opinion in which she correctly concluded that counsel was not ineffective for failing to file post-sentence motions or a direct appeal for Sackie. *See* PCRA Court Opinion, 6/9/25, at 4-24. Instantly, the PCRA court found Attorney Dutko credible and did not find Sackie either credible or able to support his vague assertions that he asked Attorney Dutko to file either post-sentence motions or an appeal on his behalf. Moreover, the record supports the conclusion that there were no issues that Attorney Dutko could have raised post-sentence that would have entitled Sackie to relief; thus, he suffered no prejudice as a result of Attorney Dutko's actions or inaction.

Here, Attorney Dutko testified at the PCRA hearing that in February 2024, he reviewed a post-sentence colloquy with Sackie, had no concerns about Sackie understanding his post-sentence rights, including what he would need to do in order to file an appeal, contacted Sackie over the phone "when it got close to his post-sentence motion date" at which time he discussed his appellate rights and whether Sackie wanted to file post-sentence motions. N.T. PCRA Hearing, 5/12/25, at 19. Sackie told counsel "that he did not want to appeal anything, a post-sentence [motion] or a direct appeal." *Id.* Attorney Dutko advised Sackie that he only "had a few days to get it in if he wanted it filed [and that] it was during that call that he told me he did not want to file anything." *Id.* at 21. Attorney Dutko had a partner in his firm write a letter memorializing that phone call and mail it to Sackie in prison. *Id.* at 19-22. Finally, counsel testified that he called Sackie's mother and advised

her that he could file a notice of appeal, but that she told him that they did not want to file one. *Id.* at 26-27. At the end of direct examination, Attorney Dutko testified that he did not recall Sackie ever asking him to file a notice of appeal or post-sentence motion. *Id.* at 30-31.

Next, Sackie claims that trial counsel was ineffective for failing to object to the trial court not giving the jury an entrapment instruction. Again, we rely upon Judge Marks' PCRA opinion to affirm the court's determination on this issue. *See* PCRA Court Opinion, 6/9/25, at 25-27. At the PCRA hearing, Attorney Dutko testified that he remembered asking the judge to give an entrapment instruction and that he knew he had spoken to Sackie about the instruction. *Id.* at 33. Moreover, the court correctly concluded that the defense of entrapment was not supported by the evidence where Sackie failed to present evidence showing that the "police['s] conduct would have induced an innocent individual to commit a crime." *See Commonwealth v. Harris*, 636 A.2d 210, 211 (Pa. Super. 1994). Here, Special Agent Kathryn Murray "did not engage in any act of overreaching that would have induced or created a substantial risk that a law-abiding citizen who did not have an intent to have oral sex with a 15[-]year[-]old [would be coerced to] engage in oral sex with a young girl of this age." PCRA Court Opinion, 6/9/25, at 26. *See Commonwealth v. Marion*, 981 A.2d 230, 239 (Pa. Super. 2009) ("Where police 'do no more than afford [a defendant] an opportunity' to commit an illegal act, their actions are not considered sufficiently outrageous police conduct to support an entrapment defense.") (citation omitted).

Having determined that there are no arguably meritorious issues "that counsel, intentionally or not, missed or misstated," **Dempster**, **supra**, we affirm the PCRA court's order and grant counsel's application to withdraw.  We instruct the parties to attach a copy of Judge Marks' decision in the event of further proceedings in the matter.

Order affirmed.  Application to withdraw granted.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/2/2026

## IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA

### CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      )
                                   )

vs.                                )      Case No. 3442/2022
                                   )

DAKINS RONESS SACKIE,          )
     Defendant                 )

\* \* \* \* \* \* \*

APPEARANCES:

        CHRISTINE F. MURPHY, ESQUIRE,
        CHIEF DEPUTY DISTRICT ATTORNEY,
           On behalf of the Commonwealth

        JEFFREY G. VELANDER, ESQUIRE,
        DEPUTY PUBLIC DEFENDER,
           On behalf of the Defendant

\* \* \* \* \* \* \* \*

### OPINION

ANNA-KRISTIE M. MARKS, J.

After a jury trial conducted from February 5, 2024 through February 7, 2024, Defendant Dakins Sackie was found guilty of Unlawful Contact with a Minor[1] and Attempted Involuntary Deviate Sexual Intercourse,[2] and not guilty on two (2) counts of Resisting Arrest.[3] Thereafter, on May 2, 2024, this Court sentenced the Defendant to the following: On the charge of Unlawful Contact with a Minor to a term of imprisonment of not less than four (4) years nor more than eight (8) years; on the count of Attempted

---

[1]    18 Pa. C.S.A. § 6318(a)(1).

[2]    18 Pa. C.S.A. § 901(a); 18 Pa. C.S.A. § 3123(a)(7) (the complainant is less than 16 years of age).

Involuntary Deviate Sexual Intercourse to a term of imprisonment in a state correctional facility of not less than three (3) years nor more than six (6) years, followed by three (3) years of consecutive probation. These sentences were ordered to run consecutively to each other. The aggregate sentence ordered was not less than seven (7) years nor more than fourteen (14) years. Thereafter, on December 31, 2024, the Defendant filed a *pro se* Post Conviction Collateral Relief Petition. Then, on January 8, 2025, Jeffrey G. Velander, Esquire, Deputy Public Defender, was appointed to represent the Defendant on his Motion for Post Conviction Collateral Relief. Presently before this Court is the Defendant's counseled Amended Motion for Relief Under Post Conviction Relief Act filed on March 31, 2025. An evidentiary hearing relative to Defendant's Motion was conducted before this Court on May 12, 2025. At the evidentiary hearing, the Defendant asserted that his trial counsel, Charles E. Dutko, Jr., Esquire, was ineffective for (1) failing to file an appeal and (2) not objecting to this Court's jury instructions. For the reasons stated below, the Defendant's arguments are without merit.

Initially we note that in order to be eligible for relief under the Post Conviction Collateral Relief Act, 42 Pa. C.S.A. § 9541, et. seq, the Defendant must have "been convicted of a crime under the laws of this Commonwealth and is at the time relief is granted, currently serving a sentence of imprisonment, probation or parole for the crime." 42 Pa. C.S.A. § 9543(a)(1)(i). In addition, the Defendant must demonstrate that the conviction or sentence resulted from one or more of the following: (1) a violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could

---

3    18 Pa. C.S.A. § 5104.

2

have taken place; (2) ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place; or (3) the imposition of a sentence greater than the lawful maximum. 42 Pa. C.S.A. § 9543(a)(2)(i); 42 Pa. C.S.A. § 9543(a)(2)(ii); 42 Pa. C.S.A. § 9543(a)(2)(vii). This Court furthermore recognizes that, applying Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984), the Pennsylvania Supreme Court has held that claims of ineffective assistance of counsel are subject to a three-part analysis: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell the defendant as a result of counsel's act or omission. Commonwealth v. Tedford, 960 A.2d 1, 12 (Pa. 2008) (adopting U.S. Supreme Court's holding in Strickland). Counsel is presumed effective and the Defendant bears the burden of proving all three prongs of this standard. Id.; Commonwealth v. Dennis, 950 A.2d 945, 954 (Pa. 2008); Commonwealth v. Meadows, 567 Pa. 344, 787 A.2d 312, 319-320 (2001). A failure to satisfy any prong of the test for ineffectiveness requires rejection of the claim. Commonwealth v. Martin, 5 A.3d 177, 183 (Pa. 2010).

Additionally, this Court recognizes that the unjustified failure to file a requested direct appeal is *per se* ineffective assistance of counsel. Commonwealth v. Lantzy, 736 A.2d 564, 571 (Pa. 1999). However, "[b]efore a court will find ineffectiveness of counsel for failing to file a direct appeal, the defendant must prove that he requested an appeal and the counsel disregarded the request." Commonwealth v. Knighten, 742 A.2d 679, 682 (Pa. Super. 1999). Where no direct appeal request was made, the defendant must establish that a duty to consult was owed. Roe v. Flores-Ortega, 528 U.S. 470, 480 (2000). Pursuant to Roe and

3

Commonwealth v. Touw, 781 A.2d 1250, 1254 (Pa. Super. 2001), a duty to consult can be established by setting forth issues of merit for further review. Roe, 528 U.S. at 480; Touw, 781 A.2d at 1254. Moreover, "consult" was defined as "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." Roe, 528 U.S. at 478; Touw, 781 A.2d at 1254. Finally, "a deficient failure on the part of counsel to consult with the defendant does not automatically entitle the defendant to reinstatement of his or her appellate rights; the defendant must show prejudice" by demonstrating that "there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." Roe, 528 U.S. at 480; Touw, 781 A.2d at 1254. With these standards in mind, we address the Defendant's issues.

The testimony presented at the evidentiary hearing on May 12, 2025 and the record evidence establish that Charles Dutko, Jr., Esquire, a private criminal defense attorney, represented the Defendant from the time of the preliminary hearing through the time of trial. After being sentenced on May 2, 2024, the Defendant was advised by Attorney Dutko of his rights to file either a Post Sentence Motion with the trial court or a direct appeal to the Superior Court of Pennsylvania. In that same vein, Attorney Dutko advised the Defendant of the relevant time frames in which he would need to file either a Post Sentence Motion or a direct appeal. Attorney Dutko was confident that the Defendant understood these post sentence rights. In addition, the Defendant executed his Post Sentence Rights form and indicated to the Court that he did not have any questions regarding same. Despite being advised of his post sentence rights and the relevant time frames, the Defendant did not request that Attorney Dutko file either a Post Sentence Motion or a Notice of Appeal with the Superior Court of Pennsylvania after he

4

was sentenced. In fact, at no time did the Defendant, whether verbally or in writing, indicate to Attorney Dutko that he wanted to file an appeal. [4]

Indeed, immediately after sentencing on May 2, 2024,[5] Attorney Dutko spoke with the Defendant's mother in the courthouse. He explained that his fee for pursuing an appeal would be $9,500.00. When the Defendant's mother expressed concern over being able to afford this fee, Attorney Dutko indicated that "there's another way." He then explained that he could file a timely Notice of Appeal and then withdraw from the case, which would allow the Defendant an opportunity to apply for a public defender to represent him on appeal. Attorney Dutko indicated that he provides this option to all of his clients. The Defendant's mother did not express a desire that a Post Sentence Motion or appeal be filed at that time, despite being advised of this option.

Consequently, on May 6, 2024, Attorney Dutko called the Defendant's mother with regards to filing Post Sentence Motions or an appeal. As she did not answer the telephone, Attorney Dutko left a voice mail message for her. Shortly thereafter, on May 8, 2024, the Defendant's mother returned Attorney Dutko's telephone call. At that time, Attorney Dutko reiterated to the Defendant's mother the legal avenues that could be pursued following sentencing, including the fee that he charges for an appeal should he continue to represent the Defendant. The Defendant's mother indicated that she did

___

[4] The Defendant testified that he had told Attorney Dutko, at some unspecified time prior to trial, that in the event that he was convicted, he wanted to appeal. Attorney Dutko testified that he had no recollection of this conversation. Moreover, this Court notes that the Defendant's testimony was extremely vague with regard to this assertion, as he provided no details nor the timing of this conversation other than "prior to trial." As such, this Court does not find the Defendant's statement to be credible.

[5] Prior to sentencing, Attorney Dutko reviewed the Defendant's Pre-Sentence Investigation Report with the Defendant. At this time, Attorney Dutko explained to the Defendant the possible sentences that he could face, as well as the issues that had been preserved for appeal. In addition, on February 14, 2024, when Attorney Dutko visited the Defendant at the Lehigh County Jail, Attorney Dutko discussed with the Defendant the issues

5

not want to pursue Post Sentence Motions nor an appeal. Attorney Dutko was surprised by the Defendant's mother's response and, consequently, wanted to follow up by personally speaking with the Defendant himself.

Therefore, on May 8, 2024, Attorney Dutko requested that his office staff reach out to the Lehigh County Jail to schedule a phone call with the Defendant on May 9, 2024. On that date, Attorney Dutko spoke directly with and consulted the Defendant. In this conversation, Attorney Dutko reiterated to the Defendant the different time lines in which to file a Post Sentence Motion and an appeal. Attorney Dutko explained that he thought that a Motion to Reconsider Sentence should be pursued in which they would argue for a lower sentence. Although Attorney Dutko did not go over the specifics of what could be appealed during this phone call, Attorney Dutko had prior discussions with the Defendant on February 14, 2024 and at the time that the Pre-Sentence Investigation report was reviewed by them together. Attorney Dutko also explained to the Defendant that he could file a timely Notice of Appeal and then withdraw from the case, which would allow the Defendant an opportunity to apply for a public defender to represent him on appeal. However, the Defendant clearly indicated that he did not want to file an appeal or Post Sentence Motions. This telephone call lasted between ten (10) and fifteen (15) minutes. As Attorney Dutko was traveling at the time of the phone call and did not have access to a computer and printer, he contacted his law partner and requested that he prepare a letter to memorialize the conversation that occurred between him and the Defendant. Attorney Dutko's law partner drafted the requested letter and mailed it to the Defendant at Lehigh County Jail. (PCRA C. Ex. 1). At no time, either during the phone conversation or thereafter, did the Defendant request that Attorney Dutko file Post

_____

that could be pursued on appeal.

6

Sentence Motions or an appeal.[6]

In addition, the record and testimonial evidence establish that prior to trial, on February 9, 2023, Attorney Dutko filed Omnibus Pretrial Motions in the nature of a Motion to Suppress Defendant's Statements (both at the scene and at the hospital), a Motion to Suppress Evidence, and a Petition for Writ of Habeas Corpus with regard to the two (2) counts of Resisting Arrest. An evidentiary hearing relative to Defendant's Omnibus Pretrial Motion was conducted before this Court on July 20, 2023. Thereafter, on October 12, 2023, this Court denied the Defendant's Omnibus Pretrial Motion. The Defendant argues that he wanted the denial of his Omnibus Pretrial Motion to have been challenged on appeal as it contained issues that merited further review. We cannot agree with the Defendant's assertion.

Specifically, in Defendant's Omnibus Pretrial Motion, the Defendant contended that at the time of the Defendant's statement regarding the ownership of his cellular phone in the parking lot of the Upper Macungie Township Motel 6, the Defendant was in custody, thereby requiring *Miranda* warnings to be read to him. The Defendant argued that the conduct of the police and their interrogation and extraction of statements of the Defendant violated his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.

This Court noted that *Miranda* rights are only required prior to a

---

[6]     After sentencing and while he was still housed in the Lehigh County Jail, the Defendant did not reach out to Attorney Dutko, either by phone or correspondence. Although the Defendant testified that he wrote a letter to Attorney Dutko while he was in state prison, Attorney Dutko credibly testified that no such letter was ever received by him or staff at his law office. The Defendant explained that this letter merely requested that Attorney Dutko contact him and did not request that Post Sentence Motions nor an appeal be filed on his behalf.

7

custodial interrogation. <u>Commonwealth v. Housman</u>, 986 A.2d 822, 839 (Pa. 2009).

In <u>In re V.H.</u>, 788 A.2d 976 (Pa. Super. 2001), a custodial interrogation and the need for *Miranda* warnings were explained in the following fashion:

> It is well-settled that the police are only required to advise a person of his *Miranda* rights if that person is subjected to custodial interrogation. The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.

<u>Id</u>. at 980. "Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Commonwealth v. Gonzalez</u>, 979 A.2d 879, 887 (Pa. Super. 2009). In that regard, not every statement made by an individual during a police encounter constitutes an interrogation. <u>Commonwealth v. Williams</u>, 941 A.2d 14, 30 (Pa. Super. 2008). Additionally, volunteered or spontaneous utterances by an individual are admissible without the administration of *Miranda* warnings. <u>Id</u>. <u>See</u> <u>also</u> <u>Commonwealth v. Bracey</u>, 461 A.2d 775 (Pa. 1983). "When a defendant gives a statement without police interrogation, we consider the statement to be 'volunteered' and not subject to suppression. Interrogation is police conduct 'calculated to, expected to, or likely to evoke admission'." <u>Commonwealth v. Schwing</u>, 964 A.2d 8, 12 (Pa. Super. 2008); <u>See</u> <u>also</u> <u>Commonwealth v. Brown</u>, 711 A.2d 444, 451 (Pa. 1998) (citations omitted); <u>Commonwealth v. Bess</u>, 789 A.2d 757, 762 (Pa. Super. 2000). Furthermore, "*Miranda* warnings are not required in certain situations where the police ask questions to ensure public safety and not to elicit incriminating

8

responses." New York v. Quarles, 467 U.S. 649, 655 (1984) (explaining that the need for answers to questions in a situation posing a threat to public safety outweighs the need for the *Miranda* warnings).

In the instant case, when Special Agent Murray ran down to the parking lot of the Motel 6 to assist in rendering aid to the Defendant, she observed a gold Apple iPhone on the ground within a foot of where the Defendant was lying. In an effort to gather his belongings, Special Agent Murray asked, "Is this your cell phone?," to which the Defendant replied in the affirmative. This Court found this inquiry to be investigatory, not accusatory. Williams, 941 A.2d at 31-33. Indeed, Special Agent Murray's inquiry was not calculated to elicit an incriminating response. As a result, this Court concluded that there was no custodial interrogation and *Miranda* warnings were not required.[7]

In addition, the Defendant also argued in his Omnibus Pretrial Motion that the statements he made to Special Agent Murray and Detective Lobach at Lehigh Valley Hospital need to be suppressed. Specifically, the Defendant contended that he did not voluntarily, knowingly, and intelligently waive the *Miranda* warnings. This Court found this argument to be without merit.

This Court noted that to safeguard an uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects subject to custodial interrogation by law enforcement officers must be warned that they have the right to

---

[7]     This Court noted that after the Defendant was *Mirandized* at Lehigh Valley Hospital, the Defendant admitted ownership of the cell phone. Commonwealth v. Charleston, 16 A.3d 505 (Pa. Super. 2015), *abrogated on other grounds*, (holding that the failure to give *Miranda* warnings did not invalidate statements made by defendant after subsequently being advised of and waiving his *Miranda* rights).

9

remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney. In re K.Q.M., 873 A.2d 752, 755 (Pa. Super. 2005), *citing*, Thompson v. Keohane, 516 U.S. 99, 107 (1995), *citing* Miranda v. Arizona, 384 U.S. 436, 444 (1966)). A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. The test for determining the voluntariness of a confession and whether an accused knowingly waived his rights looks to the totality of the circumstances surrounding the giving of the confession. Commonwealth v. Jones, 546 Pa. 161, 170, 683 A.2d 1181, 1189 (1996). See also Commonwealth v. Watkins, 843 A.2d 1203, 1213 (Pa. 2003) (stating that "the waiver of *Miranda* rights must be the product of free and deliberate choice rather than intimidation, coercion, or deception").

In the instant case, when Special Agent Murray and Officer Devery entered the Emergency Room triage bay in which the Defendant was situated, they observed the Defendant lying flat on his back, wearing a neck brace which impeded the movement of his lower jaw (and thereby impeded his speech). The Defendant was awake, his eyes were open, and he made appropriate eye contact with Special Agent Murray and Officer Devery. Officer Devery *Mirandized* the Defendant and the Defendant verbally waived those rights. Officer Devery explicitly asked the Defendant if he wished to talk with them and the Defendant unequivocally responded in the affirmative. No threats were made to the Defendant at any time during the conversation that occurred at Lehigh Valley Hospital. Both Special Agent Murray and Officer Devery were dressed in plain clothes and neither displayed their firearm. Moreover, the Defendant was not unrealistically asked to execute a physical *Miranda*

10

waiver form because his right arm was handcuffed to the hospital bed and his left arm was wrapped with a tourniquet. The Defendant did not appear to be under the influence of medication.

Special Agent Murray and Officer Devery were confident that the Defendant understood his *Miranda* warnings and all of the questions posed to him. Indeed, he answered all questions appropriately and coherently, as well as appeared upset, respectful, remorseful, and nervous that he would be reported or placed on a registry for his earlier actions. The Defendant cogently explained that his girlfriend was pregnant and due in January. Furthermore, the Defendant indicated that the reason that he went to the Motel 6 was to "get [his] dick sucked" by a 15 year old girl and that he knew that this was illegal. He confirmed that he had brought a bag of Wendy's food with him, along with a bag of Pepperidge Farm goldfish crackers. He also recounted that he ran down the hallway of the Motel 6 and fell out the window. Finally, the Defendant identified his cell phone when shown by Officer Devery, as well as provided Special Agent Murray and Officer Devery with the security passcode for his cellular telephone.

This Court found that Detective Lobach appropriately and adequately provided the Defendant with his *Miranda* warnings. Moreover, at the conclusion of his recital of the *Miranda* rights, Detective Lobach properly inquired if the Defendant wanted to speak with them, to which the Defendant replied in the affirmative. During the interview, the Defendant was oriented, appropriate, and coherent. A review of the interview established that both Detective Lobach and Special Agent Murray were calm and conversational, and they did not threaten or coerce the Defendant. This Court concluded, based on the totality of the circumstances, the Defendant knowingly,

11

voluntarily, and intelligently waived his *Miranda* rights. Furthermore, this Court noted that only after the Defendant indicated his willingness to speak, did Detective Lobach and Special Agent Murray ask the Defendant for the passcode to his cellular phone. Based on the evidence introduced at the evidentiary hearing and the totality of the circumstances, this Court found that the Defendant was legally *Mirandized* and he knowingly, voluntarily, and intelligently waived his *Miranda* rights. Therefore, this Court legally and appropriately denied the Defendant's Motion to Suppress Defendant's Statements.

Furthermore, the Defendant avers in his Amended Motion for Relief Under Post Conviction Relief Act that the evidence presented at trial was insufficient as a matter of law and that he wanted the verdict to have been challenged on appeal, as this issue merited further review. We cannot agree with the Defendant's contention.

A claim challenging the sufficiency of the evidence is a question of law which asserts that there is insufficient evidence to support at least one material element of the crime for which the Defendant was convicted. Commonwealth v. Lyons, 833 A.2d 245, 258 (Pa. Super. 2003). The standard for reviewing sufficiency challenges was explained in the following manner by the Superior Court of Pennsylvania:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.

Commonwealth v. Taylor, 831 A.2d 661, 663 (Pa. Super. 2003), *quoting* Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa. Super. 2001). In addition, the facts and circumstances established by the Commonwealth need not preclude every

12

possibility of innocence. Commonwealth v. Hunzer, 868 A.2d 498, 505 (Pa. Super. 2005). Any doubts regarding a defendant's guilt are properly resolved by the finder of fact unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact may be drawn from the combined circumstances. Id. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. Id. If the finder of fact reasonably could have determined from the evidence adduced that all of the necessary elements of the crime were established, then the evidence will be deemed sufficient to support the verdict. Id. at 506.

This Court noted that a person commits the offense of Unlawful Contact with a Minor "if he is intentionally in contact with a minor, or a law enforcement officer acting in the performance of his duties who has assumed the identity of a minor, for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within the Commonwealth; any of the offenses enumerated in Chapter 31 (relating to sexual offenses)." 18 Pa. C.S.A. § 6318(a)(1). In addition, a "person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of that crime." 18 Pa. C.S.A. § 901(a). Finally, a person commits Involuntary Deviate Sexual Intercourse "when the person engages in deviate sexual intercourse with a complainant who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other." 18 P. C.S.A. § 3123(a)(7).

In the within matter, trial was conducted from February 5, 2024 through February 7, 2024. The evidence at the trial established that on July 6, 2022 through

13

July 7, 2022, Special Agent Kathryn Murray, in her capacity as an undercover agent in the Allentown Office for the Department of Homeland Security and the Human Trafficking Task Force, engaged in a proactive investigation in which she posted ads on "Skipthegames.com," an online escort service. Special Agent Murray posted two (2) ads, one (1) entitled "2 Girl Special" which advertised two (2) girls (one of whom was 19 years old),[8] as well as an ad encaptioned "Bad Foster Mom" in which the services of a 13 year old girl were advertised. Special Agent Murray provided the phone number to her federally issued undercover cell phone number and a text number associated with this cell phone on the ads.

Many people expressed an interest in the "Skipthegames.com" ads and Special Agent Murray attempted to set up "dates" with the interested people. Specifically, one (1) individual, the Defendant, Dakins Sackie, responded to both of Special Agent Murray's posts. (C. Ex. A); (C. Ex. 1); (C. Ex. 5). Via text communications in which the Defendant referred to himself as "Amazon guy,"[9] they discussed prices, the ages of the girls, and the Defendant's interest in receiving oral sex from the 15 year old girl. (C. Ex. A); (C. Ex. 1); (C. Ex. 5). In particular, the Defendant requested a "BBBJ" ("Bareback blowjob") from the minor. (C. Ex. A); (C. Ex. 1); (C. Ex. 5). Ultimately, it was determined that payment would be chicken nuggets

---

[8] The ad did not specifically provide that the other girl was fifteen (15) years old, because skipthegames.com does not permit an ad with minors. The age of the fifteen (15) year old was elicited through text messages between the interested party and Special Agent Murray. (C. Ex. A); (C. Ex. 1); (C. Ex. 5). Special Agent Murray posed as the 19 year old girl who offered sex with the 15 year old girl to the Defendant in exchange for compensation. (C. Ex. A); (C. Ex. 1); (C. Ex. 5).

[9] In his response to one (1) of the ads, he claimed that he was an employee at the Amazon warehouse, which explained his nickname of "Amazon guy."

and French fries from Wendy's and a bag of Pepperidge Farm goldfish crackers[10] because the Defendant did not have any money and would not receive his paycheck until after 3:00 A.M. the next day. (C. Ex. A); (C. Ex. 1); (C. Ex. 5). Moreover, through the texts that Special Agent Murray and the Defendant exchanged, a meeting time on July 7, 2022, was arranged and Special Agent Murray provided the Defendant with the name of the motel, specifically, the Motel 6 located at 681 Blue Barn Road, Allentown, Upper Macungie Township, Lehigh County, as well as the floor in which she purportedly was staying.[11] Also, the Defendant texted a photograph of himself to Special Agent Murray so that she would know what he looked like. (C. Ex. A); (C. Ex. 1); (C. Ex. 5); (C. Ex. 10). Special Agent Murray also texted a photograph of herself that was photoshopped so that she looked like a 19 year old girl.[12] (C. Ex. A); (C. Ex. 1); (C. Ex. 5).

---

[10] Originally Doritos were requested, but the Defendant could not obtain them and substituted Pepperidge Farm Goldfish crackers instead. (C. Ex. A); (C. Ex. 5).

[11] Officer Drew Devery of the Upper Macungie Township Police Department and assigned to the Lehigh County Joint Human Trafficking Task Force was responsible for procuring the motel room in which the operation would take place, as well as coordinating with the Department of Homeland Security. Officer Devery was with Special Agent Murray when she received the text communications from the Defendant with regards to the ads posted on "Skipthegames.com."

[12] The text exchange on July 7, 2022 between Special Agent Murray's 19 year old persona and the Defendant is as follows:

*Defendant:* Imma just use my real number cause the other ones tweaking but yes this is the Amazon guy. So if u interested still respond back fast please.
Agent: How old are you?
*Defendant:* 22
Agent: Send me a selfie. I'll send you one of me. You're confusing me.
*Defendant:* Aight send one. (Photos exchanged) (C. Ex. 10).
Agent: That's me. My friend is 15 you ok with that?
*Defendant:* What she look like? Whatever I don't really care I just want my dick sucked by one of ya so do ya know what ya want to eat? U there?
Agent: Yeah. Ok so it's $80 for the bbbj. Anything more you need to wear a condom. My friend' can't get preg cuz she's too young. All good?
*Defendant:* U told me that already. I said I'll get us both food remember?
Agent: Just making sure we're on the same page cuz your texting me from all these diff

|               |                                                                                                                                                                                                   |
|---------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|               | numbers.                                                                                                                                                                                           |
| *Defendant:*  | We agreed that if I got ya food I'll get head. Remember?                                                                                                                                           |
| Agent:        | Wendy's. Can you get me chix nuggets and fries? You don't have a $20 or anything?                                                                                                                  |
| *Defendant:*  | Nah I don't I only got my credit card. Is that all u want chicken nugget and fries? U want me to get and then we go or want me to get it first                                                      |
| Agent:        | Oh and can you get me some Doritos and chapstick from the Wawa it's like right there? Nah bring it to me. So I can eat while my friend gives you head.                                              |
| *Defendant:*  | Aight gimme the addy again.                                                                                                                                                                        |
| Agent:        | Motel 6 off Blue barn. When can you get here?                                                                                                                                                      |
| *Defendant:*  | I'm going to get the stuff now.                                                                                                                                                                    |
| Agent:        | Ok text me when you're on the way here. Or like 5 min away. And I'll give you the room #.                                                                                                           |
| *Defendant:*  | Aight just don't try to scam me.                                                                                                                                                                   |
| Agent:        | No way!                                                                                                                                                                                            |
| *Defendant:*  | Can you send me a pic m if you in the hotel so ik u not playin? (Defendant sent exterior photo of Motel 6)                                                                                          |
| Agent:        | (Sent photo of the back of Motel 6 door of room 219)                                                                                                                                               |
| *Defendant:*  | And you too Nigga                                                                                                                                                                                  |
| Agent:        | Sent photo of the back of Motel 6 door of room 219)                                                                                                                                                |
| *Defendant:*  | I said you too not just the door                                                                                                                                                                   |
| Agent:        | I just sent you one of me. First ones free. Don't show up here all angry. I don't need that thank you.                                                                                             |
| *Defendant:*  | I trying to negotiate                                                                                                                                                                              |
| Agent:        | You did. It's $300 for the both is us and I said ok for just foog [sic]. I think that's enough negotiating                                                                                         |
| *Defendant:*  | I just wanted to know if u official                                                                                                                                                                |
| Agent:        | You got a pic of me and the hotel. That's more than I send other people. I don't need to get in trouble                                                                                            |
| *Defendant:*  | In trouble?                                                                                                                                                                                        |
| Agent:        | Cuz you askin me all these questions and pictures and shit. Idk. And my friend is young so I don't know who you are. I'm takin a chance just like you.                                              |
| *Defendant:*  | Oh my bad nah I'm just making sure for my safety too so u right (sent a photo of the Pepperidge Farm Goldfish crackers). There was no Doritos so I got you this is it cool?                          |
| Agent: Yes!   | Thank you!                                                                                                                                                                                         |
| *Defendant:*  | I can cum in her mouth right?                                                                                                                                                                       |
| Agent: Yes.   | She's cool with that. Cleanin up in the shower quick. You here?                                                                                                                                    |
| *Defendant:*  | Yeah. Pic up                                                                                                                                                                                        |
| Agent:        | Alright room 219. Just come up                                                                                                                                                                     |
| *Defendant:*  | Pick up the phone first                                                                                                                                                                            |
| Agent:        | I just called you                                                                                                                                                                                  |
| *Defendant:*  | Tell her open the door. What room number was it? There's no 219 here                                                                                                                               |
| Agent:        | 2nd floor                                                                                                                                                                                          |
| *Defendant:*  | Mad sketchy                                                                                                                                                                                         |
| Agent:        | Yes there is. By stairwell. Doors open yo. I'm gonna close it in 2 min                                                                                                                             |
| *Defendant:*  | Tell her to call me. (Sent photo of the food)                                                                                                                                                      |
| Agent:        | I don't let her talk to anyone. Come up babe                                                                                                                                                        |
| *Defendant:*  | So u come down for the food                                                                                                                                                                        |

16

Surveillance units were stationed outside of the Upper Macungie Township Motel 6, and law enforcement officers were positioned inside of two (2) of the motel rooms (Room 224 and Room 222) which were located across from the undercover room (Room 219) where the meeting was to occur. (C. Ex. A); (C. Ex. 6); (C. Ex. 7). The undercover room, Room 219, was located near the end of the second-floor north hallway, next to the stairwell. (C. Ex. A); (C. Ex. 6); (C. Ex. 7). Special Agent Murray, Detective Damein Lobach of the Allentown Police Department Vice and Intelligence Unit and assigned to the Department of Homeland Security Human Trafficking Task Force, as well as Detective Lou Tallarico of the Lehigh County Drug Task Force were positioned in Room 219. (C. Ex. A); (C. Ex. 6); (C. Ex. 7). Detective Lobach and Detective Tallarico were part of the arrest team for customers soliciting sex acts from minors and donned badges around their necks. (C. Ex. A); (C. Ex. 7).

The outside surveillance units notified Special Agent Murray when the Defendant arrived in the parking lot of the Motel 6.[13] The Defendant texted when he

| Agent: | (Sent photo of the floor plan delineating where room 219 is located). I'm not negotiating with you anymore. You're too needy. |
|---|---|
| *Defendant:* | Just do it or send her down. U getting free food |
| Agent: | She doesn't leave my side. And your gettin head for a Wendy's meal…It's not safe for us. I don't wanna get kidnapped or whatever. |
| *Defendant:* | So where is she |
| Agent: | She with me in the room. The room was propped open soon as you asked. It's open now. |
| *Defendant:* | Yo can u at least come to the lobby? That's fair. |
| Agent: | No more negotiating. We have the room ready and we're not even fully dressed. Sorry. You're wasting our time. I don't want to keep doing this back and forth. I have other customers. |
| *Defendant:* | Fine at least peep your head out the door when I'm there. You still there |
| Agent: | Ok fine. |

(C. Ex. A); (C. Ex. 1); (C. Ex. 5).

[13] Detective Lobach, from his position in Room 219, observed the Defendant exit his vehicle and walk towards the Motel 6. Detective Lobach then viewed the Defendant walk back towards his vehicle, remain there for approximately ten (10) minutes (during which time text messages continued to be exchanged with the 19 year old girl persona), and then proceed

17

arrived and sent her a photograph of the exterior of the Motel 6 to confirm same. (C. Ex. A); (C. Ex. 1); (C. Ex. 4); (C. Ex. 5). The Defendant also confirmed that he could cum in "her" mouth, referring to the 15 year old girl. (C. Ex. A); (C. Ex. 1); (C. Ex. 4); (C. Ex. 5). Throughout the exchange of text messages while the Defendant was in the parking lot of the Motel 6, he also requested that Special Agent Murray, believing her to be the 19 year old girl, direct the 15 year old girl to call him, meet him in the lobby of the Motel 6, and to open the motel room door. (C. Ex. A); (C. Ex. 1); (C. Ex. 4); (C. Ex. 5). Finally, the Defendant requested that the 19 year old girl peek her head out of the motel room. (C. Ex. A); (C. Ex. 1); (C. Ex. 4); (C. Ex. 5).

The Defendant emerged from the northern stairwell on the second floor and Special Agent Murray, dressed in jeans and a yellow tee-shirt, poked her head out as he had requested. (C. Ex. A); (C. Ex. 6). She observed the Defendant walking towards the designated motel room with the bag of Wendy's food and Pepperidge Farm Goldfish crackers in his right hand and his Apple iPhone in his left hand. (C. Ex. A); (C. Ex. 6); (C. Ex. 7). When he approached the undercover motel room door, Special Agent Murray identified herself as a police officer and immediately attempted to bring the Defendant inside the motel room in order to take him into custody.[14] (C. Ex. A); (C. Ex. 6). Special Agent Murray grabbed the Defendant's right shoulder with her left hand (while facing him), but the Defendant broke free from her grasp by forcefully pushing her arms away and bringing his hands above her head, thereby striking

---

towards the lobby of the motel. Supervising Special Agent Brent Morral observed the Defendant's actions, as well.

[14] Detective Lobach was standing approximately one (1) foot behind Special Agent Murray when the Defendant was looking into Room 219 from the threshold of the doorway. Detective Lobach was donned in plain clothes, but had his police badge prominently displayed around his neck on his chest.

18

Special Agent Murray in the face despite Special Agent Murray yelling "police" and identifying herself.[15] Upon freeing himself from Special Agent Murray's grip, the Defendant ran down the hallway towards the south end. (C. Ex. A); (C. Ex. 6); (C. Ex. 7). The Defendant ran past the stairwell located at the southern end of the hallway.[16] (C. Ex. A); (C. Ex. 6); (C. Ex. 7). He abruptly stopped near the end of the hallway where he put his hands by his waistline and quickly turned towards the police officers who had been pursuing him down the hall. (C. Ex. A); (C. Ex. 7). When the Defendant turned to face the police officers, he was still moving and he had his hands raised towards his upper body region. (C. Ex. A); (C. Ex. 7). As Detective Lobach was running immediately behind the Defendant in pursuit of him, Detective Lobach placed his arms up towards his face to protect, as he did not know if the Defendant had any weapons on him or if the Defendant was going engage him in a fight. (C. Ex. A); (C. Ex. 7). The Defendant and Detective Lobach made contact in which Detective Lobach ended up "body checking" the Defendant into the corner of the exterior wall of the hallway with the intention of creating distance between him and the Defendant. (C. Ex. A); (C. Ex. 7). However, Detective Lobach could not stop due to the momentum that had been building as a result of his speed and his weight. (C. Ex. A); (C. Ex. 7). The Defendant fell against the closed window at the end of the southern hallway, which caused the window to break and the Defendant to fall out the window. (C. Ex. A); (C. Ex. 8). Detective Lobach, despite going partially out of the window, was able to

---

[15] Special Agent Murray indicated that it felt as if she had been struck in the face with an open hand, but recognized that the Defendant was holding the food in his right hand and his Apple iPhone in his left hand, and consequently his hand could not have been open. (C. Ex. A); (C. Ex. 6).

[16] Both Special Agent Murray and Detective Lobach believed that the Defendant was running towards the southern stairwell to escape.

19

stop himself from falling by grabbing the left side of the jagged, broken glass window frame with his left arm and by planting his left leg against the exterior wall.[17]

The Defendant fell onto the macadam of the parking lot of the Motel 6 below the second-floor window and was injured. (C. Ex. A); (C. Ex. 8). Special Agent Murray's supervisor, Special Agent Morral, who was positioned outside of the Motel 6 in the front parking lot, immediately arrived in his vehicle to render aid, along with Officer Devery[18] and Detective Jamie Leauber of the Lehigh County Drug Task Force and Task Force Officer for Lehigh County Human Trafficking Task Force and Department of Homeland Security. (C. Ex. A); (C. Ex. 8). EMS was called and law enforcement attempted to keep the Defendant calm and stationary. Detective Leauber placed a tourniquet on the Defendant's left upper arm to aid in stopping the bleeding from a deep laceration on his lower left arm. (C. Ex. A); (C. Ex. 8). The Defendant's Apple iPhone 13 Pro was recovered within a foot of the Defendant lying on the ground. (C. Ex. 1); (C. Ex. 3). Ultimately, Detective Leauber obtained a search warrant for the cell phone and federal agents executed same. (C. Ex. 1); (C. Ex. 2).

The Defendant was transported to Lehigh Valley Hospital – Cedar Crest campus by EMS/ambulance for medical treatment. The Defendant suffered a neck fracture, as well as two (2) broken legs and a severe laceration of the left arm.

---

[17] Detective Lobach did not expect the glass to break and did not want the Defendant to fall out of the window.

[18] When the Defendant ran down towards the southern end of the hallway, Officer Devery exited Room 222 and utilized the stairwell on the northern end to go down to the motel lobby in case the Defendant attempted to escape by descending the southern stairs. (C. Ex. A); (C. Ex. 7). However, when Officer Devery heard glass breaking, he exited the motel, rounded the southern end of the building, and encountered the Defendant lying on the ground. (C. Ex. A); (C. Ex. 8). The Defendant attempted to sit up and Officer Devery advised him to lie back down and stay still. (C. Ex. A); (C. Ex. 8). The Defendant was alert and speaking and apologized for his actions. (C. Ex. A); (C. Ex. 8).

Detective Lobach also suffered injuries as a result of the events. In particular, he sustained a left ankle sprain, a sprain of the ligament in his left knee, and two (2) lacerations near his left elbow region, one (1) in which involved an arterial bleed. Detective Lobach sought treatment at Lehigh Valley Hospital – Cedar Crest campus. Medical personnel cauterized the artery in his left arm to stop the bleeding, as well as stitched up the wound. Detective Lobach missed approximately four (4) weeks of work as a result of his painful injuries. The treated area of his left arm remains numb/tingly due to the injury that he sustained.

Additionally, Special Agent Murray suffered injuries as a result of what transpired at the Motel 6. Specifically, the Defendant struck Special Agent Murray in the face when breaking free from her grasp. Also, when Detective Lobach attempted to pursue the Defendant, he knocked Special Agent Murray out of the way (inadvertently against the wall of the hallway) which caused an abrasion on her left arm. Consequently, Special Agent Murray sought medical attention at Lehigh Valley Hospital – Cedar Crest campus. (C. Ex. A); (C. Ex. 6); (C. Ex. 7). After Special Agent Murray was cleared by the medical personnel, and approximately one (1) hour after the Defendant had arrived at the Motel 6, Special Agent Murray and Officer Devery went to speak with the Defendant in the Emergency Room of Lehigh Valley Hospital – Cedar Crest campus about the events of the day. Special Agent Murray and Detective Devery spoke with a nurse and asked permission to speak with the Defendant. The nurse tending to the Defendant indicated that they could speak with him.

When Special Agent Murray and Officer Devery entered the Emergency Room trauma triage bay in which the Defendant was situated, they observed the Defendant lying flat on his back, handcuffed to the bed with his right hand, and

21

wearing a neck brace which impeded the movement of his lower jaw (and thereby caused his speech to be quieter). The Defendant was awake, his eyes were open, and he made appropriate eye contact with Special Agent Murray and Officer Devery who both had their badges visibly displayed. Officer Devery *Mirandized* the Defendant and the Defendant verbally waived those rights. (C. Ex. A); (C. Ex. 9). Officer Devery explicitly asked the Defendant if he wished to talk with them and the Defendant unequivocally responded in the affirmative. (C. Ex. A); (C. Ex. 9). No threats were made to the Defendant at any time during the conversation that occurred at Lehigh Valley Hospital. (C. Ex. A); (C. Ex. 9). Both Special Agent Murray and Officer Devery were dressed in plain clothes and neither displayed their firearm. Officer Devery was confident that the Defendant understood his *Miranda* warnings and all of the questions posed to him. Indeed, he answered all questions appropriately and coherently, as well as appeared upset, respectful, remorseful, and nervous that he would be reported or placed on a registry for his earlier actions. (C. Ex. A); (C. Ex. 9). The Defendant cogently explained that his girlfriend was pregnant and due in January. (C. Ex. A); (C. Ex. 9). Furthermore, the Defendant indicated that the reason that he went to the Motel 6 was to "get [his] dick sucked" by a 15 year old girl and that he knew that this was illegal. (C. Ex. A); (C. Ex. 9). He confirmed that he had brought a bag of food from Wendy's with him, along with a bag of Pepperidge Farm goldfish crackers. (C. Ex. A); (C. Ex. 9). He also recounted that he ran down the hallway of the Motel 6 and fell out the window. (C. Ex. A); (C. Ex. 9). Finally, the Defendant identified his cell phone when shown by Officer Devery, as well as provided Special Agent Murray and Officer Devery with the security passcode for his cellular telephone. (C. Ex. A); (C. Ex. 9).

22

Viewing all the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth, it is clear that the evidence was sufficient to enable a finder of fact to conclude that all the elements of the offenses were established beyond a reasonable doubt. Indeed, at the conclusion of the jury trial, the jury had no doubt that the Defendant was intentionally in contact with Special Agent Murray, who had assumed the secondary persona of a 15 year old girl, via text messaging, for the purpose of engaging in oral intercourse. Also, based on the evidence, the jury also concluded that the Defendant, with the intent of engaging in oral intercourse with a 15 year old girl, took a substantial step toward committing involuntary deviate sexual intercourse. Thus, a challenge to the sufficiency of the evidence was without merit.

Based on the foregoing, this Court finds that the Defendant did not request that an appeal or Post Sentence Motion be filed and that Attorney Dutko did not fail to consult with the Defendant about same. Also, this Court finds that there is no basis for relief, and consequently no prejudice suffered by the Defendant, as a result of any action or omission of Attorney Dutko with regard to the pretrial and post-trial issues raised by the Defendant (*supra*) and the entrapment issue (*infra*). Indeed, the evidence presented established that Attorney Dutko did reach out to and consult with both the Defendant's mother and the Defendant, not only to counsel them with regard to filing Post Sentence Motions and/or an appeal, but also to determine their wishes with regard to same. Options were provided to them with regard to legal avenues to pursue, including Attorney Dutko filing a timely Notice of Appeal and then withdrawing from the case, thereby allowing the Defendant an opportunity to apply for a public defender to represent him on appeal. Despite advising them of this option, the Defendant

23

and his mother clearly and directly conveyed to Attorney Dutko that they did not wish to pursue a Post Sentence Motion nor an appeal. Moreover, Attorney Dutko expressed that he thought that filing a Post Sentence Motion in the form of a challenge to the sentence imposed would be appropriate, but the Defendant remained firm that he did not want to file such a Motion. Although Attorney Dutko did not go over specifics as to what could be appealed during the telephone call of May 9, 2024, Attorney Dutko did have prior discussions with the Defendant on February 14, 2024 and at the time that the Pre-Sentence Investigation report was reviewed by them together with regard to appealable issues. Indeed, on those dates, the Defendant had been apprised by Attorney Dutko of the issues that could be pursued on appeal. Despite having been counseled by Attorney Dutko with regard to the advantages of filing Post Sentence Motions and/or an appeal, during the telephone call of May 9, 2024 the Defendant explicitly expressed to Attorney Dutko that he did not wish to file an appeal or Post Sentence Motions. Consequently, Attorney Dutko followed the Defendant's wishes and instructions and did not file Post Sentence Motions nor an appeal. Moreover, this Court notes that the Defendant completed a Post Sentence Information form at the time of his sentencing. The Defendant did not have any questions about this form, as he posed no questions to the Court. This form includes specific language stating that "You have the right to assistance of counsel in the preparation of a post-sentence motion or an appeal. If you are indigent, you have the right to proceed without the payment of costs and with counsel appointed to represent you without charge." As such, this Court cannot find that Attorney Dutko rendered ineffective assistance to counsel.[19]

---

[19] While this Court does *not* find that Attorney Dutko was ineffective with regard to

24

Finally, the Defendant argues that Attorney Dutko rendered ineffective assistance of counsel when he failed to object to the Court's non-inclusion of a jury instruction explaining the entrapment defense.[20] At the time of trial, Attorney Dutko argued that the entrapment jury charge, Standard Jury Instruction 8.313(4)(a)-(b), applied to the case based on the facts elicited at trial and should be provided to the jury.[21] However, as Commonwealth v. Shay, 268 A.3d 445 (Pa. Super. 2021) and Commonwealth v. Zingarelli, 839 A.2d 1064 (Pa. Super. 2003) make clear, Pennsylvania courts apply an objective test (that must be proven by a preponderance of the evidence)

---

consulting with the Defendant about filing an appeal or post sentence motions, this Court notes that the record is void of evidence to demonstrate a reasonable probability that, but for counsel's deficient consultation with the Defendant, the Defendant would have timely appealed. Thus, the Defendant has failed to show prejudice.

[20] The Defendant also contends that this Court's refusal to grant the Defendant's motion requesting that the Court provide an instruction to the jury regarding the defense of entrapment is an issue of merit that he desired to raise on appeal. However, this Court finds that the Defendant's request for the entrapment instruction was not relevant or applicable in light of the facts and evidence elicited at trial.

[21] Entrapment is an affirmative defense that must be proven by a preponderance of the evidence. The defense of entrapment is set forth in 18 Pa. C.S.A. § 313:

§ 313. Entrapment.

(a) General rule.--A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by either:

(1) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

(2) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

(b) Burden of proof.--Except as provided in subsection (c) of this section, a person prosecuted for an offense shall be acquitted if he proves by a preponderance of evidence that his conduct occurred in response to an entrapment.

(c) Exception.--The defense afforded by this section is unavailable when causing or threatening bodily injury is an element of the offense charged and the prosecution is based on conduct causing or threatening such injury to a person other than the person perpetrating the entrapment.

25

in determining if a defendant has been entrapped. Commonwealth v. Willis, 990 A.2d 773, 775 (Pa. Super. 2010). The purpose of the test it to identify police overreaching that would lead a law-abiding person to commit a crime and to prohibit a defendant from being held responsible for such outrageous and impermissible police conduct. Zingarelli, 839 A.2d at 1073. Both Shay and Zingarelli establish that merely offering an opportunity for a defendant to commit a crime is not sufficiently outrageous to support an entrapment defense. Commonwealth v. Marion, 981 A.2d 230, 239 (Pa. Super. 2009). Without question, police are permitted to utilize deceptive tactics and artifice in apprehending criminals. Shay, 268 A.3d 445.

In the within matter, the Defendant had substantial opportunity to terminate the chat/text messaging with Special Agent Murray. He did not. The Defendant acknowledged that he knew that the one (1) of the girls being offered in the ad was 15 years old. It is not relevant that initially the Defendant was interested in the ad when he knew that one of them was 19 years old. When the idea of a 15 year old girl was mentioned, the Defendant expressed interest, and his interest sustained into the following day. This Court found that Special Agent Murray did not engage in any act of overreaching that would have induced or created a substantial risk that a law-abiding citizen who did not have an intent to have oral sex with a 15 year old to engage in oral sex with a young girl of this age. In this situation, while Special Agent Murray's purpose was to obtain evidence of a crime, the facts elicited at trial did not demonstrate that Special Agent Murray induced or encouraged the Defendant to engage in the conduct constituting the crime. She merely presented an opportunity and the Defendant availed himself of it. As such, this Court's decision not to provide an entrapment instruction

---

18 Pa. C.S.A. § 313.

was legal and appropriate. Therefore, this Court cannot find Attorney Dutko ineffective for failing to object to the Court's non-inclusion of a jury instruction explaining the entrapment defense after the issue was argued and fleshed out in Court.

Accordingly, the Defendant's Motion for Post Conviction Collateral Relief is denied.